*In re: G.R.*, No. 32, September Term, 2018.  Opinion by Getty, J.

**[CRIMINAL LAW — PROBATION AND PUNISHMENT — CONDITIONS OF PROBATION — PARTICULAR TERMS AND CONDITIONS — RESTITUTION AND REPARATIONS]**

The Court of Appeals held that, where assailants stole house keys from a minor during an armed robbery, the victim's costs associated with rekeying the locks the keys corresponded to directly resulted from the underlying robbery pursuant to Criminal Procedure Article § 11-603, because theft of the keys substantially reduced the value of the locks by jeopardizing the locks' status as protectors of the sanctity and security of the home.

Circuit Court for Prince George's County
Case No. JA-17-0265
Argued: November 30, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 32

September Term, 2018

_____

IN RE: G.R.

_____

Barbera, C.J.
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, J.

_____

Filed: April 1, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"A key that opens many locks is worth buying.
A lock that can be opened with many keys isn't."

-Nabil N. Jamal, Ph.D. [1]

On numerous occasions, the Supreme Court has recognized "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton v. New York*, 445 U.S. 573, 601 (1980); *Wilson v. Layne*, 526 U.S. 603, 610 (1999). While the Supreme Court has recognized that this respect for the sanctity of the home is most often implicated within the context of the Fourth Amendment warrant requirement, in the present appeal we are asked to determine a subsidiary question. Particularly, we must determine, pursuant to the "direct result" requirement of Criminal Procedure Article ("CP") § 11-603(a), whether an award of restitution is proper for rekeying household locks where the corresponding keys were stolen during an armed robbery. For the following reasons, we answer this question in the affirmative and therefore reverse the judgment of the Court of Special Appeals.

## BACKGROUND

In this juvenile matter, a set of stolen keys to three different households constitute the central issue of restitution. Two juveniles, J.S. and J.Y., were walking home from school in the Largo area of Prince George's County on May 1, 2017. During their commute, the two were approached by a group of juveniles, including respondent G.R. An

---

[1] Dr. Jamal is a self-improvement author and a performance development training specialist. https://www.goodreads.com/author/quotes/8107388.Nabil_N_Jamal [https://perma.cc/A72W-UEB2].

altercation ensued and the assailants robbed J.S. and J.Y. at knifepoint. The assailants took from J.S. his backpack and a Samsung cell phone. Within his backpack was a key ring holding the three housekeys, two pairs of Jordan sneakers, and a binder. The keys corresponded to the locks of the exterior doors of three homes, the homes of J.S.'s mother, father, and sister.

During the course of the robbery, J.Y. attempted to intervene and assist his friend. As a result, G.R. approached J.Y. armed with a boxcutter and demanded several items from him, ultimately taking his iPhone and wallet. Thereafter, police responded to the incident and took statements from J.S. and J.Y. As the responding officers transported J.S. and J.Y. in a police cruiser to the police station to take further statements, J.S. observed three of the alleged assailants walking down the street. The officers pulled over the police cruiser, exited the vehicle, and attempted to apprehend G.R. and the other assailants. When the officers beckoned the group of juveniles, the alleged assailants took flight. Although officers were unable to catch the assailants, during the pursuit G.R. dropped a backpack. Police later determined that the backpack belonged to J.S. At the time the backpack was recovered, the keys were missing but it contained J.Y.'s iPhone and the box cutter used by G.R. in the robbery. Subsequently, police apprehended G.R.[2] At the time of his apprehension, he possessed several items stolen from J.S. These items included the set of housekeys as well as the second pair of Jordan sneakers stolen from J.S. G.R. was then

---

[2] The record does not indicate the amount of time that lapsed between the pursuit and the police eventually apprehending G.R.

2

taken, processed, and detained at Cheltenham Youth Facility ("Cheltenham"), a juvenile detention center located in Prince George's County.

At this point, the arresting officers apparently failed to properly inventory the keys stolen from J.S. According to the record, the keys were impounded by police and mistakenly held with G.R.'s personal property at Cheltenham. As a result, neither J.S. nor his family members, whose homes the keys corresponded to, were aware that the keys were in police custody. Consequently, J.S.'s family members decided to have the locks of their homes rekeyed, because of the security risk associated with the stolen keys which, unbeknownst to J.S. or his family, were being held at Cheltenham at the time.

On May 18, 2017, before the Circuit Court for Prince George's County, sitting as a juvenile court, G.R. was charged with robbery, second-degree assault, and openly carrying a dangerous weapon. In response, he pleaded involved to all the charges.[3] On June 16, 2017, the juvenile court held a restitution hearing. The State sought $120 in restitution for J.S. as follows: (1) $65 dollars to rekey the locks of the three homes of which the keys were stolen; (2) $50 for replacing the cellphone; and (3) $5 for the binder that was never recovered. During the restitution hearing, defense counsel brought to the State's, the court's, and J.S.'s attention that the keys had been recovered by police and mistakenly held with G.R.'s personal belongings at Cheltenham. Prior to this point, including the period in which the locks were rekeyed, G.R., his family, the court, and the State's Attorney were entirely unaware that the keys had been recovered.

---

[3] In juvenile matters, minors may plead or are found "involved" instead of guilty.

3

At the restitution hearing, counsel for G.R. argued to deny restitution for rekeying the locks under *Williams v. State*, 385 Md. 50 (2005) contending that there was insufficient direct causation to justify the $65 restitution. In contrast, the State argued that pursuant to *Goff v. State*, 387 Md. 327 (2005), the cost of rekeying the locks was a direct result of the robbery and assault. The circuit court agreed with the State and ultimately found G.R. liable for the entire $120 in restitution.

Subsequently, on August 15, 2017, G.R. filed a notice of appeal of the juvenile court's decision and appealed to the Court of Special Appeals. In an unreported opinion filed on May 17, 2018, the intermediate appellate court affirmed in part and vacated in part the juvenile court's order, determining that the court erred in ordering $65 in restitution to rekey the three locks. The court determined that the costs of rekeying the locks was not a direct result of the underlying robbery and concluded that "while there is undeniably a causal link between the theft of the keys and J.S.'s decision to replace his locks, that nexus does not partake of the directness required by the statute." *In re G.R.*, No. 853, Sept. Term, 2017, 2018 WL 2263819 (Md. Ct. Spec. App. May 17, 2018) (citation and internal quotation marks omitted). Subsequently, the State petitioned this Court for writ of certiorari, which we granted on August 10, 2018. *In re G.R.*, 460 Md. 492 (2018).[4]

---

[4] The State presents the following question for our review:

Where a robbery victim whose house keys are stolen takes the reasonable and prudent action of replacing the locks that correspond to the stolen keys, are the costs associated with replacing those compromised locks a "direct result" of the robbery for purposes of ordering restitution?

4

**STANDARD OF REVIEW**

Generally, an appellate court reviews a circuit court's order of restitution for abuse of discretion. *In re Cody H.*, 452 Md. 169, 181 (2017) (citing *Silver v. State*, 420 Md. 415, 427 (2011)). However, where a circuit court's order involves "an interpretation and application of Maryland statutory and case law[,]" we review its decision de novo. *Goff v. State*, 387 Md. 327, 337-38 (2005) (quoting *Nesbit v. Government Employees Ins. Co.*, 382 Md. 65, 72 (2004)). *See also In re Cody H.*, 452 Md. at 181. As the present case centers around an interpretation of the "direct result" language of CP § 11-603, we review the circuit court's restitution order under the de novo standard.

**DISCUSSION**

The statutory framework providing a court's authority to order restitution is Subtitle 6, Title 11 of the Criminal Procedure Article. Particularly, CP § 11-603 identifies appropriate grounds for restitution and, in pertinent part, provides the following:

(a) A court may enter a judgment of restitution that orders a defendant or child respondent to make restitution in addition to any other penalty for the commission of a crime or delinquent act, if:

(1) as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased;

(2) as a direct result of the crime or delinquent act, the victim suffered:

---

The State uses the term "replacing" but the locks in this instance were rekeyed. The process of rekeying locks generally involves removing the lock cylinder, replacing the lock pins or cores depending upon the type of lock involved, and issuing a new set of keys. Bill Phillips, *The Complete Book of Locks and Locksmithing*, 9-11, 43 (2005).

(i)     actual medical, dental, hospital, counseling, funeral, or burial expenses or losses;

(ii)    direct out-of-pocket loss;

(iii)   loss of earnings; or

(iv)    expenses incurred with rehabilitation;

* * *

(b) A victim is presumed to have a right to restitution under subsection (a) of this section if:

(1) the victim or the State requests restitution; and

(2) the court is presented with competent evidence of any item listed in subsection (a) of this section.

CP § 11-603. This case turns on the meaning and scope of the term "direct result" in CP § 11-603(a). However, this term is not defined in the definitions section of CP § 11-601.

The State argues that rekeying the locks was a direct result of G.R.'s delinquent act because when the keys were stolen, the sanctity of the home which those locks protected had been jeopardized. As a result, the locks had been damaged or their value "substantially decreased" to an extent cognizable under CP § 11-603(a)(1). The State describes the choice to rekey the locks as a "reasonable and prudent" or "reasonable and proportional" response to the theft of the keys. In contrast, counsel for G.R. argues that the rekeying of the locks was an intervening act too far removed from the robbery to constitute a direct result. Maryland Crime Victims Resource Center, Inc., pursuant to Maryland Rule 8-511(a)(1), filed an amicus curiae brief that argues similar to the State that the security of the homes

6

the locks belonged to had been diminished when the keys were stolen; thereby, the costs incurred rekeying the locks was a direct result of the robbery.

In prior cases, this Court has considered the direct result language of CP § 11-603(a). *In re Cody H.*, 452 Md. 169; *Williams*, 385 Md. 50; *Goff*, 387 Md. 327; *Pete v. State*, 384 Md. 47, 60-61 (2004). In *Pete*, we were asked to determine whether restitution was improperly awarded as a direct result of an underlying assault. *Id.* at 56-57. There, Mr. Pete assaulted a woman in her apartment and fled in a vehicle. *Id.* at 51. Nearly two hours later, police attempted to effectuate a stop on his vehicle. *Id.* In response, he sped away but subsequently aggressively braked his vehicle causing the police cruiser to crash into its rear-end. *Id.* at 51-52. Before the Circuit Court for Dorchester County, Mr. Pete was convicted of second-degree assault and reckless driving. *Id.* at 49. As a condition of Mr. Pete's probation, the circuit court ordered that he pay restitution to the Local Government Insurance Trust in the amount of $6,490.53 for repairs to the damaged police cruiser. *Id.* at 50.

On appeal, this Court concluded that the restitution order constituted an illegal sentence because the damages to the police cruiser were not a direct result of the assault. *Id.* at 61. The Court found the temporal relationship between the assault and the damage to the police cruiser dispositive commenting, "[i]t is easy to see on this record that the damage to the police cruiser could not be a direct result of the assault on another individual that occurred approximately two hours earlier than the vehicle collision." *Id.* at 61. In addition, the Court held that restitution could not be ordered pursuant to Mr. Pete's reckless driving charge and that the damage to the police cruiser was "undoubtedly a direct result

7

of the reckless driving."[5]  *Id.* at 56.  Therefore, we concluded that damage to the police cruiser was a direct result of Mr. Pete's reckless driving, which precluded a determination that the damage was a direct result of the earlier assault.[6]  *See id.*

Subsequently, we considered the direct result requirement within the context of a theft.  *Williams*, 385 Md. at 51.  In *Williams*, a defendant stole multiple motorcycles from a victim's garage.  385 Md. at 51-52.  After apprehending the defendant, police held three of the motorcycles at an impoundment lot in Baltimore City.  *Id.* at 52.  However, the victim was unable to recover the three motorcycles because he had never properly acquired title to the vehicles.  *Id.* at 53.  The Circuit Court for Baltimore County awarded the victim restitution in the amount of $1,500.  *Id.* at 54.  On appeal, we vacated the circuit court's restitution order on the basis that the victim's failure to recover the motorcycles from the impoundment lot was not a direct result of the theft and commented,

> Jones's inability to reclaim the undamaged motorcycles was not the direct result of Williams's theft of them.  While there is undeniably a causal link between the theft

---

[5] The court determined that restitution could not be ordered with respect to Mr. Pete's reckless driving charge because,

[u]nder § 11–603, restitution may be ordered to a victim "as a direct result of the crime...."  § 11–603(a)(1).  A crime includes "a violation of the Transportation Article that is punishable by a term of confinement." § 11–601(d)(2).  Any person convicted of reckless driving under § 21–901.1 is guilty of a misdemeanor and only "subject to a fine of not more than $1,000."  Md. Code (1977, 2002 Repl. Vol.), § 21–101(g) of the Transportation Article.

*Pete*, 384 Md. at 56–57.

[6] In later decisions, to be discussed shortly, we read *Pete* as standing for the proposition that restitution may not be awarded where there is an intervening agency, occurrence, or event which severs direct causality.  *See Goff*, 387 Md. at 343-344; *Williams*, 385 Md. at 61.

8

in Baltimore County and the motorcycles ending up in the Baltimore City impoundment lot, that nexus does not partake of the directness required by the statute. Moreover, Jones's failure to produce proof of ownership to secure release of the vehicles is in no way a direct result of their underlying theft. The aftermath of the theft in this case merely revealed Jones's possible failures to title properly the motorcycles with the State and/or register them with Baltimore County. If Jones can muster some means of proving ownership and satisfy the Baltimore City authorities, he presumably will be able yet to recover the undamaged vehicles.

*Id.* at 62. Accordingly, we determined that the victim's failure to properly title the motorcycles directly caused his inability to regain possession of them. *Id.* at 62-63.

In *Goff*, we held that damage to a victim's shower insert was a direct result of an assault and the circuit court did not err in ordering restitution to the victim for costs associated with replacing it. 387 Md. at 350. In that case, Mr. Goff forced entry into the victim's apartment, assaulted the victim in the bathroom, and damaged the shower insert. *Id.* at 332-33. In relation to these events, Mr. Goff was found guilty of second-degree assault and trespass. *Id.* at 331. Thereafter, the victim had the shower replaced rather than repaired. *See id.* at 333-34. The circuit court found restitution warranted and ordered Mr. Goff to pay restitution in the amount of $2,156.00 for the replacement of the damaged shower insert. *Id.* at 336.

Before this Court, Mr. Goff argued that the circuit court's order of restitution was in error because: "(1) the damage to the shower is not the direct result of the crime; (2) the shower is not the property of the victim; and (3) ordering replacement instead of repair is not fair and reasonable." *Id.* at 339. The *Goff* Court focused its analysis on the "natural and ordinary meaning" of the term "direct result" noting that we employ "basic principles of common sense" in our interpretation of the words. *Id.* at 344 (quoting *Schmerling v.*

9

*Injured Workers' Ins. Fund*, 368 Md. 434, 444 (2002). The Court turned to the dictionary definition of "direct" establishing it as meaning "stemming immediately from a source, [as in direct] result ... proceeding from one point to another in time or space without deviation or interruption ... marked by absence of an intervening agency, instrumentality, or influence[.]" *Id.* at 344 n. 9 (quoting Merriam-Webster's Collegiate Dictionary 327 (10th ed. 2001). In substantial reliance on *Pete*, 384 Md. 47, we determined that the shower lining was damaged as a direct result of the underlying assault. *See Goff*, 387 Md. at 343-44. In a footnote, we distinguished *Goff* from *Pete* based on the lack of time elapsing between the assault and the damage to the shower and the lack of an "intervening agent or occurrence [that] caused the damage."[7] *Goff*, 387 Md. at 344 n. 10.

More recently, we considered the direct result terminology in terms of a restitution order for loss of earnings. *In re Cody H.*, 452 Md. at 184. We reiterated our conclusion in *Goff* by stating our interpretation of CP § 11-603(a) as "something is a 'direct result' where there is no intervening agent or occurrence separating the criminal act and the victim's loss." *Id.* at 195. (citing *Goff*, 387 Md. at 344). Additionally, we noted that restitution cannot be ordered based upon expenses that are speculative or not "reasonably certain to

---

[7] As noted above, the *Pete* court held that the damage to the police cruiser was the direct result of Mr. Pete's reckless driving charge and not the underlying assault, indicating that the act of reckless driving was an intervening event that directly caused the damage. *Pete*, 384 Md. at 57.

be incurred." *In re Cody H.*, 452 Md. at 186 (quoting *McDaniel v. State*, 205 Md. App. 551, 563).[8]

In the case *sub judice*, the Court of Special Appeals found *Williams* instructive and distinguished this case from *Goff*. Primarily, the intermediate appellate court concluded that the decision to rekey the locks was an intervening occurrence that directly resulted in any diminishment in value of the locks or out-of-pocket costs associated with rekeying instead of a result from the underlying robbery. Although the court found our analysis in *Goff* instructive, the court distinguished it from the instant appeal on the basis that there was no intervening act or occurrence in *Goff* and the assault and subsequent damage to the shower insert occurred in close temporal proximity. Instead, the intermediate appellate court determined that that this case is analogous with *Williams*, 385 Md. 50 (2005).[9] A majority of G.R.'s arguments are based on the contention that the decision to rekey the locks was an intervening occurrence that directly resulted in the associated costs of rekeying them.

Overall, G.R.'s contentions overlook a subtle yet important nuance. Restitution may be ordered where the value of a victim's property is substantially decreased as a direct result of a crime or delinquent act. CP § 11-603(a)(1). Despite this, G.R. attempts to frame

---

[8] The Court of Special Appeals in *McDaniel* noted that this requirement is subsumed under the requirement of CP § 11-603(b) that victims present competent evidence of such expenses. 205 Md. App. At 563.

[9] As noted above, this Court in *Williams*, held that the victim's failure to properly title several motorcycles, and not the underlying theft of those motorcycles, directly caused the costs associated with the victim's loss. *Williams*, 385 Md. at 62-63.

the substantial decrease or damage to the locks as occurring when the locks were rekeyed. However, as the State and Amicus point out, the value of the locks was substantially decreased when the keys were removed from the possession of J.S. during the course of the underlying robbery.  For several reasons, we find G.R.'s contentions unpersuasive.

Household locks and the corresponding keys represent a greater ideal that can often be forgotten in the context of the everyday objects we encounter in our daily routines. Primarily, they represent the safety and sanctity of the home by protecting individuals from unwanted intrusions upon their personal privacy and safeguard against property crimes. Essentially, household locks and keys ensure the sanctity and security of the home.  When such keys are taken by assailants through an armed robbery, such personal security is drawn into question.  A victim can only be left to wonder whether future intrusions on the sanctity of the home may occur as a result of the stolen keys.

On this point, the Court of Special Appeals commented,

> [G.R.'s] delinquent act of robbing J.S. caused no immediate damage to any of the locks, **even if common sense might suggest that a loss of confidence in home security might flow from the theft of the keys.**  Instead, the damage occurred when J.S. incurred costs by choosing to replace the three locks, presumably to restore his family's security.

*In re G.R.*, No. 853, Sept. Term, 2017, 2018 WL 2263819 (Md. Ct. Spec. App. May 17, 2018) (emphasis added).  As is evident, the intermediate appellate court declined to engage in an analysis concerning whether the value of the locks had substantially decreased as a direct result of the underlying robbery.  Instead, the court focused on determining that the locks were contemporaneously undamaged when the keys were stolen.  CP § 11-603(a)(1)

12

does not require that the locks be damaged.  Rather, a substantial decrease in their value is sufficient to justify an award of restitution.

The Court of Special Appeals erred in its direct result analysis by holding that the decision to rekey the locks was an intervening occurrence.  The court distinguished the instant appeal from *Goff* by stating that "[h]ere, however, J.S. acted as an intervening agent when he made the decision to replace the locks at his family members' homes following the robbery of his keys." *In re G.R.*, No. 853, Sept. Term, 2017, 2018 WL 2263819 (Md. Ct. Spec. App. May 17, 2018).  Instead, the Court found *Williams* determinative:

> As in *Williams*, where the victim's failure to properly title his motorcycles severed the required nexus to the crime, J.S.'s decision to change the locks at his family member's homes likewise severed the nexus to appellant's delinquent act.  In the parlance of *Williams*, while there is undeniably a causal link between the theft of the keys and J.S.'s decision to replace his locks that nexus does not partake of the directness required by the statute.

*Id.*  (internal quotation marks omitted).

However, as we noted in *Williams*, our conclusion was largely based on the fact that the victim, if he were sufficiently able to prove ownership of the motorcycles, would be able to reclaim the motorcycles.  385 Md. at 62-63.  We determined that Mr. Williams' theft of the motorcycles did not directly cause the victim's inability to regain them, because the victim's failure to properly title the motorcycles directly caused the victim's loss.  *Id.*

The factual scenario set forth in *Williams* is immediately distinguishable from the decision to rekey the locks in the instant case.  In *Williams*, the victim could have negated any damages incurred through the loss of the motorcycles by sufficiently proving ownership of the vehicles because he would have been able to regain them.  385 Md. 50,

13

62 ("If Jones can muster some means of proving ownership and satisfy the Baltimore City authorities, he presumably will be able yet to recover the undamaged vehicles.") Based on the facts before us, the substantial decrease in the value of the locks could only be remedied by return of the keys without them being copied, or by rekeying the locks. Here, there is neither an indication that the victim was culpable to any degree nor that the cost associated could have been avoided independently of the underlying theft. Therefore, the facts of this case distinguish it from *Williams*.

The direct result analysis of the current appeal leads us to a different conclusion when compared to *Williams* or *Pete*. In the instant case, the decision to rekey the locks cannot be described as an intervening occurrence to the extent that it would negate a direct causal relationship between G.R.'s armed robbery of J.S. in which the house keys were stolen. This case is more analogous to *Goff*. In *Goff*, the damage to the shower was directly and contemporaneously caused by Mr. Goff's assault on the victim. *Goff*, 387 Md. at 331-332. Mr. Goff's decision to replace the shower insert was not deemed an intervening occurrence and therefore did not preclude an award of restitution. *Id.* at 344.

In the instant case, although the locks were not directly damaged by the underlying robbery and theft of the corresponding keys, their value as protectors of household security and sanctity was substantially decreased. Despite the lapse of time between the robbery and the decision to rekey the locks, rekeying the locks was remedial in a similar fashion to replacing the damaged shower insert in *Goff*. The rekeying was necessary to repair the substantial decrease in the value of the locks – the compromised security of the homes those locks protected. Accordingly, the decision to rekey the locks was not an intervening

14

event as their substantial decrease in value can be directly attributed to G.R.'s delinquent act of robbery.

To hold otherwise and require "immediate damage" to sustain an order of restitution would largely contravene cases in which we have held that restitution may be ordered for lost wages. [10] *See In re Cody H,* 452 Md. at 189-90, 193 (holding that restitution for lost wages was permissible, where a juvenile's jaw was broken during an assault and he was later unable to participate in a work study program which he had yet to start). Moreover, if restitution required immediate damage it would be unavailable for claims based upon future losses of earnings, which we have held are not prohibited under CP § 11-603. *Id.* at 188. We determined that restitution for future loss wages may be proper where, "the award meets both the statutory and decisional law limitations, i.e., the claim is not speculative, the claim covers losses reasonably certain to occur, the loss was a direct result of the crime or delinquent act, and the claim is shown by competent evidence." *Id.* In short, the Court of Special Appeals' immediacy requirement largely stands in opposition to our precedent concerning orders of restitution based on future lost wages and may, in certain circumstances, call into question orders of restitution based on lost wages generally.

---

[10] *In re Cody H*. did not involve a claim for future earnings. *Id.* at 189-90 n. 5,6. Rather, the juvenile victim there was contracted and scheduled to take part in a work-study program which he had not begun prior to the assault but restitution was ordered for lost wages that had been incurred up until the time of the restitution hearing. *Id.* In that situation, the damage would not be immediate, because the victim had yet to earn wages at the time of the assault and injury. *See id.* at 189-90 n. 5,6. This would have precluded a determination that the lost wages were the direct result of the underlying assault.

Although G.R. notes that the keys were recovered and kept in a juvenile detention center shortly after G.R.'s arrest, both the victim and the State were unaware that the keys had been recovered until the restitution hearing before the juvenile court on June 16, 2017, over one month after the keys were initially stolen. We cannot say that this should be determinative of the outcome. If J.S. was aware that police recovered the keys, before the locks had been rekeyed, our conclusion may differ. In that situation, although copies of the keys could have been made, there would be a more substantial question as to the substantial decrease in value of the locks as a direct result of the theft. However, these are not the facts before us. Neither J.S. nor the State was aware that the keys had been recovered.

Accordingly, we determine that G.R.'s robbery of J.S., in which the house keys were taken, substantially decreased the value of the corresponding locks. This necessitated rekeying the locks to protect the security and sanctity of the homes to which those keys belonged. Therefore, we reverse the judgment of the Court of Special Appeals.

We next briefly turn our analysis to consider the State's reasonableness arguments regarding the decision to rekey the locks and its resemblance to a tort causation analysis. In prior cases, we have rejected interpretations of CP § 11-603(a) that attempted to predicate proximate or mere nexus causation standards as incompatible with the statute's plain language. *Pete*, 384 Md. at 60-61. The *Pete* Court rejected arguments attempting to import a tort causation analysis into the direct result analysis of CP § 11-603(a) as contrary to intent of the legislature:

16

The General Assembly has required a direct result between the qualifying crime committed and the damages inflicted before restitution may be ordered. Any attempt by a court to craft a proximate causation, mere nexus, or single charging document substitute would be clearly contrary to the plainly-worded intent of [CP] § 11–603.

384 Md. at 61. *See also Goff*, 387 Md. at 343 (affirming the rejection of a tort causation analysis as set forth in *Pete*, 384 Md. 47).

We take this opportunity to reaffirm that importing any tort causation analysis into the direct result standard of CP § 11-603(a) would straightforwardly contravene the plain language of the statute. As the Honorable Glenn T. Harrell, Jr. explained in *Pete*, "[t]he dangers of relying on a type of tort causation analysis are almost too numerous to summarize." *Pete*, 384 Md. at 60-61 n. 15. As those dangers are explained in detail there, we need not describe them at length here. *See id.* (rejecting tort causation analysis within the context of restitution for several reasons including: (i) that restitution is a criminal sanction distinct from civil remedies; (ii) the nebulous nature of proximate cause standards in tort analysis; and (iii) procedural differences between criminal and civil cases such as burdens of proof and the roles of the parties).

The State contends that rekeying the locks was justified as it is a "reasonable and prudent" response to the robbery. However, a reasonableness standard is only invoked twice within the entirety of Subtitle 6, Title 11, of the Criminal Procedure Article. *See* CP § 11-604 (referring to a parent's "reasonable opportunity to be heard and to present evidence[,]" not relevant to the present appeal); CP § 11-615. The latter statutory provision references a reasonableness requirement within two contexts:

(a) In a restitution hearing held under § 11-603 of this subtitle, a written statement or bill for medical, dental, hospital, counseling, funeral, or burial expenses is legally

17

sufficient evidence of the amount, fairness, and reasonableness of the charges and the necessity of the services or materials provided.

(b) A person who challenges the fairness and reasonableness or the necessity of the amount on the statement or bill has the burden of proving that the amount is not fair and reasonable.

CP § 11-615.

The State's references to any reasonableness standard rely on cases in which the Court has analyzed this provision instead of CP § 11-603(a). *Goff*, 387 Md. at 349 (answering a question presented regarding whether the restitution ordered was fair and reasonable); *In re Cody H.*, 452 Md. at 194 (concluding that the victim "was presumed to have a right to restitution. [The assailant] has not overcome this presumption by showing that the restitution was unfair or unreasonable."). Consequently, the State's reliance on these cases in an attempt to justify imparting a reasonableness requirement unto the direct result standard of CP § 11-603(a) is unpersuasive, as both reference a different statutory provision – CP § 11-615. Accordingly, the reasonableness of a replacement or repair should not be determinative or play a substantial role within this Court's direct result analysis pursuant to CP § 11-603(a). Nevertheless, the reasonableness of a restitution order is relevant and ensured through CP § 11-615. Therefore, we additionally conclude that the State's references to reasonableness, within the context of the direct result requirement of CP § 11-603(a), are misguided as attempting to posit a tort causation standard within the context of direct result analysis.

## CONCLUSION

In summation, we conclude that G.R.'s robbery of J.S., in which several house keys were stolen, directly resulted in a substantial decrease of value of those locks because it brought into question the underlying security of the homes those keys belonged to. Based on the record before us, the decision to rekey the locks was not an intervening act. Instead, it was a necessary action taken to restore and maintain the sanctity and security of the homes to which the keys belonged. Accordingly, we reverse the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

19