*Johnson v. State*, No. 1330, September Term, 2023.  Opinion by Nazarian, J.

**SENTENCING – RESTITUTION**

The friend's fatal overdose was not the "direct result" of the defendant's conduct of selling drugs to that friend because the friend's act of taking the drugs was as an intervening event, and a sentence of restitution to cover the friend's funeral costs is an illegal sentence. Md. Code (2001, 2018 Repl. Vol.), § 11-603(a)(2) of the Criminal Procedure Article.

Circuit Court for Queen Anne's County
Case No. C-17-CR-17-000290

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1330

September Term, 2023

_____

NATHAN JOSEPH JOHNSON

v.

STATE OF MARYLAND

_____

Nazarian,
Beachley,
Eyler, James R.,
  (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: December 30, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

On November 4, 2016, Brendon Roe passed away after overdosing on heroin that he got from his friend and fellow addict Nathan Johnson. Mr. Johnson was charged and convicted in the Circuit Court for Queen Anne's County of involuntary manslaughter, reckless endangerment, and multiple possession and distribution offenses in connection with the sale and Mr. Roe's death. He received a prison sentence followed by five years of probation. As a condition of probation, the court ordered Mr. Johnson to pay restitution to Mr. Roe's parents in the amount of $8,750 for Mr. Roe's funeral expenses. After Mr. Johnson's first appeal, this Court reversed his involuntary manslaughter conviction, and the circuit court later vacated that conviction.

The issue before us now concerns the restitution order. Because Mr. Johnson had not paid restitution to Mr. Roe's parents, the State brought charges against him for violating the terms of his probation.[1] Mr. Johnson moved to have the restitution order vacated as an illegal sentence because he was no longer convicted of involuntary manslaughter. The circuit court denied his request and this appeal followed. We hold that the restitution order is an illegal sentence and reverse the restitution component of Mr. Johnson's sentence.

---

[1] At Mr. Johnson's violation of probation hearing, the State acknowledged that Mr. Johnson made some restitution payments to Probation and Parole after being charged with violating his probation.

# I.    BACKGROUND

## A.    Factual Background

We explained the events that led to Mr. Roe's death in *Johnson v. State*, 245 Md. App. 46 (2020) (*Johnson I*). An abbreviated recap will suffice for the purposes of this appeal.

On November 3, 2016, Mr. Johnson and Mr. Roe began texting one another at around noon to discuss how to obtain drugs that they both intended to use. A few hours later, Mr. Johnson acquired drugs from "[a] guy at work," and agreed to sell a portion to Mr. Roe that evening. They continued to text throughout the day and arranged later for Mr. Johnson to drive to Mr. Roe's mother's house where Mr. Roe was living at the time to conduct the sale. According to Mr. Roe's mother, Mr. Roe left the house at around 9:30 p.m., approximately the same time Mr. Roe texted Mr. Johnson to meet him outside. Mr. Roe's mother texted Mr. Roe asking where he went, and he responded that he was outside with Mr. Johnson. Mr. Roe came back inside at around 9:45 p.m. and went to his bedroom. A few hours later, Mr. Roe's mother found Mr. Roe face down in his bed having died of "Acrylfentanyl and Heroin Intoxication."

Mr. Johnson told the police a different story. He said he drove to Mr. Roe's house to drop off a fishing pole and to pick up $40 that Mr. Roe owed him for a side job. He claimed Mr. Roe decided to keep the $40 to purchase heroin from "JJ Moore" later that night. But when the police inspected Mr. Roe's phone, they found that the limited communication between Mr. Roe and JJ Moore didn't correspond with the timeline of events leading to Mr. Roe's death. Mr. Johnson was arrested and charged with involuntary

manslaughter, reckless endangerment, possession with intent to distribute heroin, possession with intent to distribute acrylfentanyl, possession of heroin, and possession of acrylfentanyl.

### B.     Procedural History

After a bench trial, the circuit court convicted Mr. Johnson on all counts. The court sentenced Mr. Johnson to ten years of incarceration, all but seven years suspended, for involuntary manslaughter and a consecutive term of twenty years of incarceration, all but five years suspended, for distribution. The court also issued a Probation/Supervision Order stating that Mr. Johnson would serve five years of probation upon his release from prison. And in addition to the standard probation conditions, the court ordered Mr. Johnson to pay restitution in the amount of $8,750, the cost of Mr. Roe's funeral, to Mr. Roe's parents.

Mr. Johnson appealed, arguing that the evidence was insufficient to support his distribution and involuntary manslaughter convictions, that the circuit court abused its discretion in admitting text messages between Mr. Johnson and Mr. Roe, and that the circuit court erred in imposing separate sentences for his involuntary manslaughter and distribution convictions. In *Johnson I*, this Court reversed Mr. Johnson's involuntary manslaughter conviction and affirmed the remaining convictions. The State filed, and we denied, a Motion to Reconsider and Remand for Resentencing. The State then filed a petition for a writ of *certiorari* that the Supreme Court granted. After oral argument, the Court remanded the case to us, without affirming or reversing, with directions that we clarify why we denied the State's motion for reconsideration. We issued a clarifying opinion, *see Johnson v. State*, 248 Md. App. 348 (2020), and the Supreme Court dismissed

the petition for writ of *certiorari* as improvidently granted. *State v. Johnson*, 471 Md. 429 (2020) (per curiam). The case returned to the circuit court and the court vacated Mr. Johnson's involuntary manslaughter conviction and corresponding sentence.

On June 8, 2023, the Department of Public Safety and Correctional Services ("DPSCS") filed a Payment Violation Report notifying the circuit court that Mr. Johnson had failed to pay the charges imposed as a condition of his probation, including the $8,750 for funeral expenses. Mr. Johnson filed a Motion for Appropriate Relief, asking the circuit court to vacate the restitution order as an illegal sentence. The circuit court denied the motion and this appeal followed.[2]

## II. DISCUSSION

Mr. Johnson argues on appeal that the restitution order requiring him to pay $8,750 to Mr. Roe's parents for funeral expenses as a condition of his probation is an illegal sentence because Mr. Roe's death was not a direct result of Mr. Johnson's conduct. Although he concedes that there "may be a 'causal link' between [his] remaining convictions and Mr. Roe's death," he contends that that link doesn't satisfy the "direct result" requirement contained in Md. Code (2001, 2018 Repl. Vol.), § 11-603(a)(2) of the Criminal Procedure Article ("CP"). The State, on the other hand, argues that the "causal link" between the drug sale and Mr. Roe's death *is* sufficient to find that Mr. Roe's death was a direct result of Mr. Johnson's conduct. We agree with Mr. Johnson that the "direct result" piece of CP § 11-603 is missing here—not because Mr. Johnson's remaining

---

[2] The circuit court has stayed Mr. Johnson's violation of probation hearing until this appeal is resolved.

4

convictions aren't connected to Mr. Roe's death, but because Mr. Johnson's *conduct* was not the direct cause of Mr. Roe's death.[3]

A trial court has discretion to order restitution as part of a sentence or as a condition of probation if "as a direct result of the crime or delinquent act, the victim suffered . . . actual medical, dental, hospital, counseling, funeral, or burial expenses or losses . . . ." CP § 11-603(a)(2); *see also* CP § 6-221 (trial courts may "suspend the imposition or execution of sentence and place the defendant on probation on the conditions that the court considers proper"). Whether imposed as a sentence or a condition of probation, restitution is a "criminal sanction, not a civil remedy," *Grey v. Allstate Ins. Co.*,

---

[3] In his brief, Mr. Johnson highlights the fact that he is no longer convicted of involuntary manslaughter and suggests that the vacatur of that conviction drives the outcome here. Although it is true that "a trial court may not order a criminal defendant to pay restitution to a victim of a crime for which he was not convicted," *Silver v. State*, 420 Md. 415, 428 (2011), CP § 11-603 requires a direct connection between the defendant's *conduct* that led to the conviction and the victim's injury, not between the conviction and the injury. *See Hall v. State*, 225 Md. App. 72, 97–98 (2015) (defendant convicted of burglary and acquitted of malicious destruction of property still required to pay restitution for damage to victim's door because the damage occurred when defendant broke into the house to commit burglary); *Goff v. State*, 387 Md. 327, 344 (2005) (defendant ordered to pay restitution to assault victim to cover cost of repairing showerhead that was broken "during and because of" the assault even though defendant was not convicted of a property damage crime). *But see Walczak v. State*, 302 Md. 422, 433 (1985), *abrogation on other grounds recognized by Savoy v. State*, 336 Md. 355 (1994) (defendant who robbed two victims, but was only convicted of robbing one, didn't have to pay restitution to victim who was not the subject of the charged robbery because defendant was not convicted of any criminal conduct as to that victim); *Silver*, 420 Md. at 430 (defendants convicted of animal cruelty as to one out of three horses didn't have to pay restitution to cover vet costs associated with two other horses because they were not convicted of any criminal conduct as to those horses).

As a result, neither the fact that Mr. Johnson's involuntary manslaughter conviction was vacated nor the fact that he remains convicted of reckless endangerment resolves this question by itself—we need to perform the direct result analysis regardless.

363 Md. 445, 451 (2001), that is designed to serve as a form of punishment and rehabilitation for the defendant and to compensate the victim for their losses. *Pete v. State*, 384 Md. 47, 55 (2004) (citations omitted).

Despite the trial court's broad discretion under these statutes, our Supreme Court has made "clear that restitution may be compelled only where the injury results from the actions that made the defendant's conduct criminal." *State v. Stachowski*, 440 Md. 504, 513 (2014). This is true as well when a court orders restitution as a condition of probation:

> A probation order for a criminal conviction conditioned on restitution must meet the minimum requirements of: (1) a victim with property damage of the type enumerated in § 11-603, and (2) the damage to the victim be the direct result of the crime for which the defendant was convicted and for which it was directed.

*Pete*, 384 Md. at 65. And because "[a]n order to pay restitution as a condition of probation is part of the punishment for the crime," a defendant can challenge a restitution condition as an illegal sentence when the requirements of CP § 11-603 aren't met. *Goff v. State*, 387 Md. 327, 340 (2005).

Ordinarily, we review a trial court's decision to order restitution for abuse of discretion. *Ingram v. State*, 461 Md. 650, 659 (2018) (*citing Silver v. State*, 420 Md. 415, 427 (2011)). But where review of a trial court's restitution order involves the interpretation and application of Maryland law—such as, for example, the meaning of "direct result" under CP § 11-603—we review the court's order *de novo*. *Id.*

"Determining whether an injury is a 'direct result' of the criminal conduct is central traditionally to mapping the outer limits of a trial court's discretion in ordering restitution

6

in most cases." *Stachowski*, 440 Md. at 513. The injury for which restitution is ordered must result "from the actions that made the defendant's conduct criminal," *id.*, which requires more than "proximate causation, mere nexus," or charges connected solely by virtue of a "single charging document." *Pete*, 384 Md. at 61.

The phrase "direct result," as it appears in CP § 11-603, is not defined in the Criminal Procedure Article. "[W]hen statutory definitions are not explicitly provided, 'we determine the intended scope of the term by applying the language's natural and ordinary meaning, by considering the express and implied purpose of the statute, and by employing basic principles of common sense . . . .'" *Goff*, 387 Md. at 344 (*quoting Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 444 (2002)). We need not, then, look further than the plain meaning of "direct result."[4] *See id.* (relying on the "natural and ordinary meaning of the term 'direct result'"). Indeed, the Court summed it up well in *In re Cody*, 452 Md. 169 (2017): "something is a 'direct result' where there is no intervening agent or occurrence separating the criminal act and the victim's loss." *Id.* at 195; *see also Goff*, 387 Md. at 344 n.9 (relying on the Merriam-Webster definition of "direct": "stemming immediately from a source, . . . marked by absence of an intervening agency, instrumentality, or influence. . . ."").[5] The question for us is whether Mr. Roe's act of taking

---

[4] As the Court determined in *Pete*, there is nothing in the bill files of H.B. 1680— the first instance in which "direct result" appeared in what is now CP § 11-603—suggesting that "'direct result of the crime' means anything other than that discerned from the plain language." *Pete*, 384 Md. at 58 n.14; H.D. 1680, 1977 Leg., 383rd Sess. (Md. 1977).

[5] It's worth adding that "direct injury" is defined in *Black's Law Dictionary* as "[a]n injury resulting directly from a particular cause, *without any intervening causes*." *Direct Injury*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added).

the drugs he obtained from Mr. Johnson was an intervening occurrence that broke the direct causal link between Mr. Johnson's act of selling the drugs and Mr. Roe's fatal overdose.

Mr. Johnson relies on *Pete v. State*, 384 Md. 47 (2004), and *Williams v. State*, 385 Md. 50 (2005), to argue that his conduct was not the direct cause of Mr. Roe's death. In *Pete*, the defendant assaulted a woman, fled the scene in his truck, then caused a collision when he stopped abruptly at a red light and the police cruiser following him crashed into the back of his truck. 384 Md. at 51–52. After the court convicted him of assault, reckless driving, and various other traffic violations, the defendant received a fine for misdemeanor reckless driving and a prison sentence followed by probation for the assault. *Id.* at 52–54. As a condition of probation, the court ordered the defendant to pay restitution to the Local Government Insurance Trust for the damage to the police cruiser. *Id.* On appeal, our Supreme Court found the restitution order to be an illegal sentence because the damage to the cruiser was a direct result of the defendant's reckless driving, not the assault for which he received a sentence:

> [I]t was improper for the court to order restitution as a condition of probation for the second degree assault conviction when Patrolman Cheesman and the police cruiser were neither the victim of the second degree assault nor were damaged as a direct result of that crime.

*Id.* at 66.

In *Williams*, the defendant stole four motorcycles that the police later found and impounded until the victims could claim them. 385 Md. at 52. When one of the victims arrived to claim three of the motorcycles, the authorities refused to return the motorcycles to him because he never got them titled in his name. *Id.* At the defendant's sentencing for

8

theft, the trial court ordered the defendant to pay $1,500 in restitution to the victim to cover the loss of the motorcycles. *Id.* at 54. On appeal, the Court vacated the restitution order, finding that, "[w]hile there is undeniably a causal link between the theft . . . and the motorcycles ending up in the Baltimore City impoundment lot, that nexus does not partake of the directness required by [CP § 11-603]." *Id.* at 62. The victim's failure to title the motorcycles, not the underlying theft, was the direct cause of his inability to recover them from the lot. *Id.*

In sum, a separate or intervening event—the reckless driving in *Pete* and the failure to acquire title to the motorcycles in *Williams*—caused the victim's loss in each case, not the defendant's conduct. *Pete*, 384 Md. at 66 (holding the cruiser was not damaged as a direct result of the assault);[6] *Williams*, 385 Md. at 63 ("Any loss that [the victim] may have suffered . . . is not represented in the record by any damage to or loss of value caused directly by the theft."). Mr. Johnson makes a similar argument—he contends that Mr. Roe's act of taking the drugs, not Mr. Johnson's act of selling him the drugs, was the direct cause of Mr. Roe's death. We agree.

The State claims that the Supreme Court has "unanimously rejected" the intervening cause theory for a CP § 11-603 direct result analysis, comparing this case to *In re G.R.*, 463 Md. 207 (2019), and *Shannon v. State*, 241 Md. App. 233 (2019). But both cases are

---

[6] In *Pete*, the Court declined to "apply a tort proximate cause analysis" as requested by the defense and instead focused on the plain meaning of "direct result." *Id.* at 60–61. Although the Court didn't use the words "intervening cause" to explain its conclusion, the Court acknowledged later in *In re G.R.* that *Pete* "indicat[ed] that the act of reckless driving was an intervening event." *In re G.R.*, 463 Md. at 218 n.7.

distinguishable from this one. In *In re G.R.*, the respondent committed a robbery, stealing the keys to three different houses in the process. 463 Md. at 210–11. The respondent pleaded involved to robbery, second-degree assault, and openly carrying a dangerous weapon. *Id.* at 212. At his restitution hearing, the court ordered the respondent to pay $65 to cover the cost of rekeying the three homes, among other costs. *Id.* The respondent appealed that order, which this Court affirmed, finding that "the decision to rekey the locks was an intervening occurrence that directly resulted in any diminishment in value of the locks or out-of-pocket costs associated with rekeying instead of a result from the underlying robbery." *Id.* at 218–19.

The Maryland Supreme Court reversed, finding that the decision to rekey the locks was *not* an intervening occurrence. *Id.* at 225. The Court distinguished *Williams* by explaining that "the victim could have negated any damages incurred through the loss of the motorcycles" by properly acquiring title, whereas the victims in *In re G.R.* could only remedy the decreased value of their locks by rekeying them.[7] *Id.* at 221. Importantly, the Court noted that rekeying the locks was "necessary":

> [A]lthough the locks were not directly damaged by the underlying robbery and theft of the corresponding keys, their value as protectors of the household security and sanctity was substantially decreased. Despite the lapse of time between the robbery and the decision to rekey the locks, . . . *[t]he rekeying*

---

[7] Another remedy would have been returning the keys without them being copied. *In re G.R.*, 463 Md. at 221. But this wasn't an option at the time of the restitution hearing because the keys were detained mistakenly at the Cheltenham Youth Facility (the juvenile detention center where the respondent was held) with the rest of the respondent's personal belongings, and neither the victims, the homeowners, nor the respondent were aware of the keys' location. *Id.* at 211.

> *was necessary to repair the substantial decrease in the value of the locks*—the compromised security of the homes those locks protected. Accordingly, the decision to rekey the locks was not an intervening event as their substantial decrease in value can be directly attributed to G.R.'s delinquent act of robbery.

*Id.* at 222 (emphasis added).

We applied the Court's ruling in *In re G.R.* to affirm the restitution order in *Shannon*. There, the defendant opened fire at the victims' car as they were moving into their new home and threatened to burn their house down if they didn't leave. 241 Md. App. at 238–39. Although they had already paid the security deposit and first month's rent, the victims abandoned their lease "without spending a single night in the house." *Id.* at 246. As part of his sentence for threatening arson and illegally possessing a firearm, the court ordered the defendant to pay the victims $2,400 in restitution to cover the security deposit and first month's rent. *Id.* at 237. On appeal, we determined that the victim's decision to abandon their lease was a necessary action analogous to rekeying the locks in *In re G.R.*:

> *In re G.R.* teaches that restitution may encompass expenses incurred to remediate "the security and sanctity" of a victim's home after it has been compromised as a "direct result" of the defendant's criminal conduct.
>
> * * *
>
> [V]acating the property under police escort was the immediate and direct result of appellant's armed threats of arson and . . . abandoning the lease was *necessary* in the aftermath of those crimes.

*Id.* at 256–57 (emphasis added).

In both cases, the victims engaged in actions "necessary" to re-secure their houses after the defendants compromised the safety of their homes. Rather than rejecting an

11

intervening cause analysis broadly—one grounded in the plain meaning of direct result and not in the negligence theory of proximate causation—the Supreme Court, and later this Court, refused to declare those *necessary* actions to be intervening causes. *In re G.R.*, 463 Md. at 222; *Shannon*, 241 Md. App. at 255. That result is consistent with the Supreme Court's regular use of an intervening cause analysis when reviewing trial courts' restitution orders. *See, e.g.*, *Williams*, 385 Md. at 62 (intervening cause); *Pete*, 384 Md. at 61 (intervening cause); *In re Cody H.*, 452 Md. at 195 (no intervening cause); *In re G.R.*, 463 Md. at 218 (the Court "distinguished *Goff* from *Pete* based on . . . the lack of an 'intervening agent or occurrence [that] caused the damage'" (*quoting Goff*, 387 Md. at 344 n.10)). So although we found that the Supreme Court had "unanimously rejected" the intervening cause argument under the facts of *In re G.R.*, *see Shannon*, 241 Md. App. at 250, the Court did not, as the State suggests, do away with the intervening cause analysis as a means of reviewing whether a defendant's conduct was the direct cause of a victim's injury for purposes of restitution.

Unlike the victims' failure to title the motorcycles in his name in *Williams*, the victims in *In re G.R.* and *Shannon* effectively had no choice but to rekey their homes or abandon their lease because of the defendants' criminal conduct. *See Williams*, 385 Md. at 62. And unlike the reckless driving in *Pete*, there was no separate occurrence that diminished the value of the victims' homes in *In re G.R.* and *Shannon*. *See Pete*, 384 Md. at 61.

In this case, Mr. Roe himself took the drugs that he obtained from Mr. Johnson. Taking the drugs was not an action necessary to remedy an injury caused by Mr. Johnson's

conduct, nor was it Mr. Roe's only option under the circumstances.[8] Although Mr. Roe taking the drugs probably was the most likely outcome, the foreseeability of Mr. Roe's actions is irrelevant in this context,[9] as is Mr. Johnson's mental state at the time of the sale. Like the victim's inability to reclaim his motorcycles in *Williams* due to his failure to obtain proper title, 385 Md. at 62–63, Mr. Roe's death came about due to his own actions. So, although Mr. Johnson's sale of drugs to Mr. Roe may have contributed to, or even initiated, the chain of events leading to Mr. Roe's death by "provid[ing] [Mr.] Roe with the lethal drugs," as the State put it, that connection is insufficient, much like the insufficient connection in *Williams* between the defendant's theft and the victim's motorcycles ending up in the impoundment lot. *Id.* at 62. It's not enough for a defendant's actions to have set in motion a chain of events that led eventually to the victim's injury. The defendant's conduct must *be* the event that directly caused the victim's injury.

We hold that Mr. Roe's death was not the direct result of Mr. Johnson's criminal conduct and that the restitution ordered as a condition of Mr. Johnson's probation is an illegal sentence. We reverse the circuit court's denial of Mr. Johnson's Motion for

---

[8] We are expressing no opinion here on addiction or the impact it can have on those who suffer from it.

[9] "Foreseeability" is often a key component of a negligence proximate cause analysis under tort law, which is "exactly [the] manner of analysis that the Legislature foreclosed by allowing restitution only where the loss was the 'direct result of the crime.'" *Williams*, 385 Md. at 61 n.9; *see also* Dan B. Dobbs et al., *The Law of Torts* § 205, Westlaw (database updated Apr. 2024) ("[C]ourts usually reduce the tests of scope of liability or proximate cause [in negligence cases], both in direct and in intervening cause cases, to a question of foreseeability.").

Appropriate Relief and, therefore, the portion of the judgment ordering him to pay restitution relating to Mr. Roe's funeral expenses.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY REVERSED AS TO THE ORDER THAT THE APPELLANT PAY RESTITUTION RELATING TO FUNERAL EXPENSES. QUEEN ANNE'S COUNTY TO PAY THE COSTS.**