*Teddy Shannon v. State of Maryland*, No. 2378, September Term 2017.
Opinion by Thieme, Raymond G., Jr., J. (Senior Judge, Specially Assigned).

**SENTENCING – RESTITUTION – "DIRECT RESULT" STANDARD – CP § 6-103(a) – FORFEITED RENT AND SECURITY DEPOSIT.** In sentencing appellant for convictions for threatening arson and possessing a firearm after a disqualifying conviction, the sentencing court did not err in ordering restitution of $2,400, representing first month's rent and security deposit for premises that the victims never occupied and had to abandon as a direct result of appellant's crimes. Restitution for those expenses is consistent with the Court of Appeals' recent decision in *In re G.R.*, ___ Md. ___, No. 32, Sept. Term 2018, 2019 WL 1434571 (filed Apr. 1, 2019), applying the "direct result" standard for restitution under Md. Code, § 11-603(a) of the Criminal Procedure Article, in the context of crimes that threaten the safety and sanctity of the victims' home. The "household protection" rationale articulated in *G.R.* extends to reimbursement of victims forced to move for their personal safety in the aftermath of a crime. Given the immediate and continuing diminishment in the value of the property as a family residence, resulting from appellant's threats to burn it down, the record supports the sentencing court's determination that forfeiture of the security deposit and first month's rent was a direct result of appellant's crimes.

Circuit Court for Baltimore City
Case No. 117013002

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2378

September Term, 2017

_____

TEDDY SHANNON

v.

STATE OF MARYLAND

_____

Nazarian,
Arthur,
Thieme, Raymond G., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Thieme, J.

_____

Filed:  June 4, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

As the Cannon family was moving into a new home in Baltimore, they were fired upon, then threatened by an armed neighbor who vowed to burn the residence. A jury in the Circuit Court for Baltimore City acquitted Teddy Shannon, appellant, of charges in the shooting but convicted him of threatening arson and illegally possessing a firearm after a disqualifying conviction. Appellant was sentenced to a total of seventeen years and ordered to pay restitution of $2,400, as reimbursement for the Cannons' security deposit and first month's rent under the lease they abandoned after this altercation.

Appellant presents the following issues for our review:

1. Must Appellant's conviction and sentence for possession of a regulated firearm be vacated because it is based upon an indictment that fails to charge an offense?

2. Did the trial court err in ordering restitution?

For reasons that follow, we conclude there are no grounds to vacate appellant's convictions or the restitution order. In resolving the restitution challenge, we apply lessons from the Court of Appeals' recent holding in *In re G.R.*, ___ Md. ___, No. 32, Sept. Term 2018, 2019 WL 1434571 (filed Apr. 1, 2019), considering the "direct result" standard for restitution under Md. Code, § 11-603(a) of the Criminal Procedure Article ("CP") as it relates to costs incurred "to restore and maintain the sanctity and security" of a household made insecure by criminal activity. In the circumstances presented here, we conclude that the trial court did not err or abuse its discretion in ordering restitution for a lease payment for premises abandoned by the victims after appellant threatened to burn down the building.

## BACKGROUND

On December 10, 2016, Jason Cannon and his family "were moving into the house on the corner" at 1738 East 30th Street in Baltimore. Before taking possession of the premises, Latonya Coleman-Cannon paid their landlord $2,400, representing a security deposit and the first month's rent. Appellant lived across the street, at 1735 East 30th Street.

That evening, Mr. Cannon and a friend had just parked on the street in front of the new residence when Cannon "heard multiple shots" and "tires screeching." As Cannon got out of his car, "a guy from across the street approached" them, carrying a gun, "and said, what's up with you all, yo?" Cannon also heard someone say, "pick up all the shells, yo."

While Cannon was walking up the steps into the new house, he heard conversation among the crowd gathered in the street, concerning a distinctive white Lexus SUV targeted in the shooting. Cannon knew his stepson had been driving to the new house with a friend, in his mother's white "old school" Lexus SUV. Cannon turned around and confronted the group, asking "why were they shooting at us." Appellant, who was carrying a gun, answered, "[T]his is my block. I protect my block. We shoot first, ask questions second."

After his friend pulled him into the house, Cannon was able to contact his stepson and his companion, who were "up the block[.]" When Cannon drove to them, he discovered that the Lexus had shattered windows and was "riddled with bullets." He called 911, then returned to the new house.

2

While they waited for police, Ms. Coleman-Cannon arrived in a separate vehicle. "[I]rate" over the shooting, she confronted individuals in the street. Cannon, attempting to de-escalate the situation, pulled her "around the back of the house[.]"

Appellant followed and approached them. Lifting his jacket to display a gun, he stated

> that if any shots were fired off that night that he was going to blow the house up. He was going to burn the house down. He was going to kill the kids in my house. Call the police if I want. They're not welcomed on my block.

Afraid for their lives, the Cannons went inside the house and "slammed the door."

When police officers arrived on the block, it "was extremely hectic" and "chaotic." Outside in the street, there were "[a] lot of people" "yelling, screaming." They were upset with the Cannons, calling them "snitches and stuff like that[.]" Appellant, who was saying "vulgar things . . . a lot of negative things[,]" was arrested because he met "the description of the person who was shooting a weapon[.]"

According to Detective Marcus Sanders, appellant made "threats of . . . violence and arson . . . not only to the officers that were on the scene, but initially, as well as to the residents that were actually right across the street." Video from the detective's body camera, which recorded the encounter with appellant, was played for the jury.

Police secured appellant's house until a search warrant was executed. In that search, police recovered the leather jacket worn by appellant that evening, which later tested positive for gunshot residue. In addition, officers recovered a "silver Ruger handgun," a

3

"30 round magazine for a Glock," a "40 caliber" shell casing, and ammunition for different weapons.

Based on statements made by appellant during a phone call recorded on December 11, while he was incarcerated, police obtained a warrant to search a house at 1645 Abbotston Street, where the name "Teddy" was written on the living room wall. In the recorded call, appellant, referring to "Chris" as the person who "do got it[,]" agreed that "he had it he walked out wit it[.]" At the Abbotston Street residence, police recovered a "black Glock 27, which is a 40 caliber[,]" "on the top floor outside roof," "inside of a black trash bag" and "wrapped up." Firearms examination established that the shell casing recovered at appellant's residence was from a cartridge fired from the Glock recovered at 1645 Abbotston Street.

We shall add material from the record in our discussion of the issues raised by appellant.

## DISCUSSION

### I.  Indictment

Appellant contends that his firearm conviction must be vacated because it is premised on an indictment that did not allege a criminal offense. This challenge arises from the following portion of the indictment, which states in pertinent part:

#### FIFTH COUNT

. . . DEFENDANT, Teddy SHANNON, late of said City, heretofore on or about December 10, 2016, at the 1700 block of East 30th Street, in the City of Baltimore, State of Maryland, **having been convicted of a crime of violence, as defined in Public Safety Article, Section 5-101(c), to wit:**

4

**05/09/2008, Possession with Intent to Distribute, Case No.: 107312013**, did possess a regulated firearm, to wit: <u>Ruger P90DC, .45 Caliber Handgun</u>, in violation of Public Safety Article, Section 5-133(c) of the Annotated Code of Maryland; against the peace, government and dignity of the State.

[PS 5-101; PS 5-133(c)] 1 1609

(Underlining in original; boldface added.)

The crime charged in this count of the indictment is a violation of § 5-133(c) of the

Public Safety Article ("PS"), which provides in pertinent part:

**Penalty for possession by convicted felon**

(c)(1) A person may not possess a regulated firearm if the person was previously convicted of:

(i) **a crime of violence**;

(ii) **a violation of § 5-602,** § 5-603, § 5-604, § 5-605, § 5-612, § 5-613, § 5-614, § 5-621, or § 5-622 of the Criminal Law Article; or

(iii) an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (i) or (ii) of this paragraph if committed in this State.

(Emphasis added.)

The problem presented by Count Five is not a matter of dispute. Although Public

Safety § 5-101(c) defines a "crime of violence" as one of eighteen enumerated offenses,

none of those predicate offenses is possession of a controlled dangerous substance with

intent to distribute, which is the offense appellant was convicted of on May 9, 2008, in

Case No. 1073122013. Count Five mistakenly identifies the predicate conviction for this

charge under PS § 5-133(c), by mislabeling "Possession with Intent to Distribute" as a

"crime of violence."

Appellant contends that because the predicate offense identified in Count Five was not a crime of violence as alleged in the indictment, "the trial court was deprived of jurisdiction to render a verdict or impose a sentence" on that count. In support, appellant cites precedent establishing that "where no cognizable crime is charged, the court lacks fundamental subject matter jurisdiction to render a judgment of conviction, i.e., it is powerless in such circumstances to inquire into the facts, to apply the law, and to declare the punishment for an offense." *Williams v. State*, 302 Md. 787, 792 (1985) (citing *Pulley v. State*, 287 Md. 406, 415-16 (1980); *Urciolo v. State*, 272 Md. 607, 616 (1974)). *See also* Md. Rule 4-252(d) ("A motion asserting failure of the charging document to show jurisdiction in the court or to charge an offense may be raised and determined at any time."). Alternatively, appellant argues that "an additional basis for vacating [his] conviction and sentence for possession of a regulated firearm" is Md. Rule 4-345(a), providing that "[t]he court may correct an illegal sentence at any time." *See, e.g., Johnson v. State*, 427 Md. 356, 362 (2012) (vacating conviction and sentence on ground that "sentence for assault with intent to murder was illegal because that crime was not contained in the indictment returned by the Grand Jury").

The State, acknowledging the "drafting error" in the indictment, points out that appellant failed to complain about the mistake when it "could have been corrected by a simple amendment to the indictment at any time prior to entry of the verdict." Moreover, the State continues, "this drafting error had absolutely no bearing on [appellant's] due process right to a fair trial or on the court's jurisdiction to impose the conviction and

6

sentence." Nor was appellant "prejudiced by this drafting error" because the defense "stipulated that he had a prior disqualifying conviction, under Section 5-133(c)," and "the jury was made aware of [his] prior criminal activity through recordings of two jail house calls" during which the jury learned that appellant "had a prior assault conviction, which would have qualified as a 'crime of violence' under [PS] § 5-101(c)(2) or (3)." For this reason, the State maintains that appellant "was properly convicted of violating . . . Public Safety, § 5-133(c), and the sentence imposed was legal."

## A.      Legal Standards Governing Indictments

Under Article 21 of the Maryland Declaration of Rights, "in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence[.]" The purpose of this guarantee is

> "(i) to put the accused on notice of what he is called upon to defend by characterizing and describing the crime and conduct; (ii) to protect the accused from a future prosecution for the same offense; (iii) to enable the defendant to prepare for his trial; (iv) to provide a basis for the court to consider the legal sufficiency of the charging document; and (v) to inform the court of the specific crime charged so that, if required, sentence may be pronounced in accordance with the right of the case. . . . [I]n order to place an accused on adequate notice, two different types of information ought to be provided by the charging document. . . .
>
> First, it is essential that [the charging document] characterize the crime, and second, it should furnish the defendant such a description of the particular act alleged to have been committed as to inform him of the specific conduct with which he is charged. . . . As to the former of these dual requisites, where a statutory offense is alleged, it has generally been held in Maryland that, at least where the terms of the statute include the elements of the criminal conduct, the crime may be sufficiently characterized in the words of the statute."

*Counts v. State*, 444 Md. 52, 57-58 (2015) (quoting *Ayre v. State*, 291 Md. 155, 163-64 (1981)).

"'[I]t is elementary that a defendant may not be found guilty of a crime of which he was not charged in the indictment.'" *Johnson v. State*, 427 Md. 356, 375 (2012) (quoting *Turner v. State*, 242 Md. 408, 414 (1966)). Convicting a defendant of a crime that was not charged "'would be a sheer denial of due process.'" *Stickney v. State*, 124 Md. App. 642, 646 (1999) (quoting *De Jonge v. Oregon*, 299 U.S. 353, 362, 57 S. Ct. 255 (1937)); *accord Johnson*, 427 Md. at 376 (citing *Dunn v. United States*, 442 U.S. 100, 107, 99 S. Ct. 2190 (1979); *Turner v. New York*, 386 U.S. 773, 775, 87 S. Ct. 1417 (1967); *Landaker v. State*, 327 Md. 138, 140 (1992)).

Implementing these protections, the Maryland Rules provide that "[a]n offense shall be tried only on a charging document." Md. Rule 4-201(a). A charging document must "contain a concise and definite statement of the essential facts of the offense with which the defendant is charged." In addition, "[t]he statute or other authority for each count shall be cited at the end of the count, but error in or omission of the citation of authority is not grounds for dismissal of the charging document or for reversal of a conviction." Md. Rule 4-202(a).

A court may amend an indictment "at any time before verdict . . . except that if the amendment changes the character of the offense charged, the consent of the parties is required." Md. Rule 4-204. This rule "gives effect to Article 21" rights, by precluding unilateral changes to the substance of charged offenses. *See Counts*, 444 Md. at 57. *Cf.*

8

*Beckwith v. State*, 320 Md. 410, 414-15 (1990) (a reasonable defendant would conclude that he was charged under a particular subsection to the exclusion of another subsection when the indictment charged the defendant "in a way which clearly appeared to exclude" one of those charges).

When determining "the character of the offense," courts look at "what is stated in the body of an indictment, not the statutory reference or caption." *Thompson v. State*, 371 Md. 473, 489 (2002) (citing *Busch v. State*, 289 Md. 669, 678 (1981)). The statutory reference in a charging document "'exists as a matter of convenience to the parties and the court, and thus possesses no substance of its own.'" *Id.* (quoting *Ayre*, 291 Md. at 168 n.9).

As the Court of Appeals has recognized, substituting different criminal acts in an indictment constitutes a "change in the character of the charged offense" even if both acts are prohibited by the same statute. "When the State delineate[s] the particular section of the statute, . . . it charge[s] only the conduct and circumstances proscribed by that section, and, absent appellant's consent, [is] barred from later amending the indictment to charge different circumstances." *Tapscott v. State*, 106 Md. App. 109, 135 (1995). "[W]here a specific criminal act has been charged, another may not be substituted for it on the theory that it is simply a matter of 'form.'" *Thanos v. State*, 282 Md. 709, 716 (1978) (amendment substituting allegation that defendant "remove[d]" a price tag, for allegation that defendant "alter[ed]" a price tag, erroneously changed the character of the offense, even though defendant was charged with violating the same section of the code). *Cf. Johnson v. State*, 358 Md. 384, 392 (2000) ("An amendment, changing the identity of the controlled

9

dangerous substance, changes an element of the offense charged, and charges the defendant with a different offense. Such an amendment, without the defendant's consent, is not permitted."); *Clark v. State*, 218 Md. App. 230, 255 (2014) (offenses of wearing, carrying, or transporting a handgun differed depending on allegation that it occurred "on or about the person" or "in a vehicle traveling on a roadway").

## B.    Appellant's Challenge

Appellant contends that Count Five is fatally flawed because it charges the wrong predicate offense for his conviction for possessing a firearm after a disqualifying conviction.  To be sure, the offenses codified in PS § 5-133(c)(i) and PS § 5-133(c)(ii) "contain distinct elements that are not included in the other," because the two subsections require proof of different predicate offenses as the disqualifying prior conviction.  Both subsections are implicated because the indictment mislabels "Possession with Intent to Distribute" as a "crime of violence," while correctly identifying that offense both by name and provenance (i.e., a judgment on "05/09/2008" in "Case No.: 107312013").  Although the caption in Count Five does not specify by number which subsection of § 5-133(c) is charged, the body of the indictment misidentifies the predicate conviction of "Possession with Intent to Distribute" as a "crime of violence."  Consequently, we must treat the original indictment as charging a violation of PS § 5-133(c)(i). *See Thompson*, 371 Md. at 489.

In turn, because appellant's indictment charged a violation of subsection 5-133(c)(i), an amendment with appellant's consent was necessary to change the character

10

of that predicate offense to a violation of subsection 5-133(c)(ii). *Cf. Counts*, 444 Md. at 65-66 (court erred in unilaterally substituting felony theft for misdemeanor theft); *Busch*, 289 Md. at 679 (court erred in substituting charge of resisting arrest for charge of resisting, obstructing, or hindering an officer in performance of his duties). We conclude that appellant agreed to change the character of the predicate offense when he stipulated that he had been "convicted of a crime for which he is prohibited from possessing a regulated firearm under the Public Safety Article 5-133(c)."

Thereafter, the trial court instructed the jury that "[t]he State and Defendant agree and stipulate that the Defendant was previously convicted of a crime that disqualifies him from possessing a regulated firearm." In closing, the prosecutor reminded the jury that "[w]hether or not he is a prohibited person is no longer in question" because "[t]here is a stipulation that he is not allowed to possess [a regulated firearm]."

By admitting that his prior conviction made it illegal for him to possess a firearm under PS § 5-133(c), appellant agreed that Count Five of the indictment properly charged a violation of § 5-133(c), based on an admitted predicate conviction. In doing so, appellant necessarily agreed to change the character of the charged offense. For that reason, appellant is not entitled to reversal of his firearm conviction based on the initial prosecutorial drafting error corrected by his stipulation.

## II.    Restitution

Appellant next challenges the order requiring him to pay $2,400 in restitution to Ms. Coleman-Cannon, to reimburse her for the deposit and first month's rent she paid on the

11

residential lease for 1738 East 30th Street, before her family fled without spending a single night in the house. In appellant's view, "even if there is some causal link between the threat of arson and the breaking of the lease," her loss merely had a "reasonable connection," but was not the "direct result" of those crimes that is required under CP § 11-603(a), because Ms. Coleman-Cannon's "decision to break the lease" was the intervening cause for her loss.

We disagree. While this appeal was pending, the Court of Appeals held that out-of-pocket expenses incurred when residences became insecure as a result of a robbery satisfied the "direct result" standard for restitution under CP § 11-603(a), in *In re G.R.*, __ Md. __, No. 32, Sept. Term 2018, 2019 WL 1434571, at *3 (filed Apr. 1, 2019). Applying lessons from that decision, we hold that the sentencing court did not err or abuse its discretion in ordering restitution for the forfeited security deposit and rent, because that loss was a direct result of appellant's armed threats of arson against that residence and its occupants.

### A. Legal Standards Governing Restitution

An illegal restitution order may be challenged at any time, as an illegal sentence. *See Goff v. State*, 387 Md. 327, 340 (2005). "We review a trial court's restitution order ordinarily for abuse of discretion." *Ingram v. State*, 461 Md. 650, 659 (2018). S*ee In re G.R.,* 2019 WL 1434571, at *3. If "determining the propriety of a restitution order" involves a matter of "statutory interpretation, however, the review is conducted without deference to the trial court's action." *Ingram*, 461 Md. at 659.

12

An order to pay restitution "as part of a sentence" under CP § 11-603(a) is "a criminal sanction, not a civil remedy." *State v. Stachowski*, 440 Md. 504, 512 (2014) (citation omitted). Although restitution may have "a therapeutic and rehabilitative function with respect to the defendant, its predominant and traditional purpose is to reimburse the victim for certain kinds of expenses that he or she incurred as a direct result of the defendant's criminal activity." *Chaney v. State*, 397 Md. 460, 470 (2007). "It is not a judicially imposed gift to the victim, but reimbursement that the defendant, personally, must pay." *Id.*

This public policy is implemented in Subtitle 6, of Title 11 of the Criminal Procedure Article. Pertinent to this appeal, CP § 11-603 provides:

**Grounds for restitution**

(a) A court may enter a judgment of restitution that orders a defendant . . . to make restitution in addition to any other penalty for the commission of a crime . . . , if . . .

> (2) as a direct result of the crime . . . , the victim suffered . . .

> (ii) direct out-of-pocket loss . . . .

**Victim presumed to have right to restitution**

(b) A victim is presumed to have a right to restitution under subsection (a) of this section if:

> (1) the victim or the State requests restitution; and

> (2) the court is presented with competent evidence of any item listed in subsection (a) of this section.

"Determining whether an injury is a "'direct result' of the criminal conduct is central traditionally to mapping the outer limits of a trial court's discretion in ordering restitution

13

in most cases." *Stachowski*, 440 Md. at 513. As the Court of Appeals has explained, "[o]ur cases are clear that restitution may be compelled only where the injury results from the actions that made the defendant's conduct criminal." *Id*. at 513. The Court of Appeals has rejected "proximate causation, mere nexus, or single charging document" theories for restitution, instead requiring "a direct result between the qualifying crime committed and the damages inflicted before restitution may be ordered." *Pete v. State*, 384 Md. 47, 60-61 (2004).

In *Pete,* the Court vacated a restitution order covering collision damages that the defendant caused to a police vehicle while he was fleeing apprehension following an assault he committed two hours earlier. *See id.* at 51, 57. The Court held that "restitution to the [Local Government Insurance Trust] as part of a sentence for the second degree assault conviction was inappropriate under § 11-603 because the damage to Patrolman Cheesman's cruiser did not arise as a 'direct result' of the second degree assault on Ms. Raickle." *Id*. at 57. The Court rejected the victims' direct result argument, reasoning that

> the collision with, and resultant damage, to Patrolman Cheesman's cruiser are a direct result of Pete's reckless driving, not his assault on Ms. Raickle. The damage to the cruiser is a direct result of Pete stopping abruptly, from a relatively high rate of speed, in the path of the cruiser. Reckless driving, by definition, is driving with a "wanton or willful disregard for the safety of persons or property." § 21-901.1 of the Transportation Article. In this case, Pete's wanton or willful disregard was for the safety of Patrolman Cheesman, his police cruiser, and possibly any other person, vehicle, or property on the same roadway or placed at risk by Pete's driving. It is easy to see on this record that the damage to the police cruiser could not be a direct result of the assault on another individual that occurred approximately two hours earlier than the vehicle collision.

*Id.* at 61.

14

While this appeal was pending before us, the Court of Appeals decided *In re G.R.*, No. 32, Sept. Term, 2018, 2019 WL 1434571, at *3 (filed Apr. 1, 2019), affirming a restitution award covering the cost of rekeying residential locks after a robbery. Invoking Supreme Court precedent recognizing that "the overriding respect for the sanctity of the home that has been in our traditions since the origin of the Republic[,]" the Court held that "pursuant to the 'direct result' requirement of § 11-603(a), . . . an award of restitution is proper for rekeying household locks where the corresponding keys were stolen during an armed robbery." *Id*. at *1 (citing *Payton v. New York*, 445 U.S. 573, 601, 100 S. Ct. 1371 (1980); *Wilson v. Layne*, 526 U.S. 603, 610, 119 S. Ct. 1692 (1999). After distinguishing *Pete* and other cases applying the "direct result" requirement under CP § 11-603(a), the Court determined that the theft of the keys

> directly resulted in a substantial decrease of value of those locks because it brought into question the underlying security of the homes those keys belonged to. Based on the record before us, **the decision to rekey the locks was not an intervening act. Instead, it was a necessary action taken to restore and maintain the sanctity and security of the homes to which the keys belonged.**

*Id.* at *9 (emphasis added).

## B.    Appellant's Challenge

Appellant, relying on *Pete*, argues that

> the direct-result standard set forth by the legislature forbids restitution for the deposit and first month's rent paid by Coleman-Cannon. The threat of arson crime [sic] for which Appellant was convicted may have directly caused Coleman-Cannon to experience fear but it directly caused nothing else. What Coleman-Cannon sought was restitution for losses that she chose to assume. Her fear did not necessitate her response . . . . Another person in Coleman-Cannon's situation might have chosen to stay. Thus, to award restitution in

15

this case is to introduce a subjective dimension to the "direct result" standard. As a result, all things being equal, punishment for the same crime – threat of arson – includes significant restitution for one defendant, and no restitution for the other. Allowance for such wide variance is inconsistent with the narrow scope given to the "direct result" test.

We conclude that appellant's argument rests on an "intervening cause" theory that the Court of Appeals unanimously rejected in *In re G.R.* After examining that decision, we will apply its holding and reasoning to appellant's challenge.

### 1.    *In re G.R.*

G.R. was involved in conduct that, if committed by an adult, would constitute the crime of robbery, after evidence established that he stole, at knifepoint, valuables that included keys to three residences. *See id*. at *1-2. The juvenile court ordered restitution that included reimbursement of $65 for the cost of rekeying locks to those residences. *See id*. at *2. This Court vacated that portion of the restitution order, holding that the out-of-pocket expense was not a direct result of the robbery. *See id.*

The Court of Appeals, agreeing that "[t]his case turns on the meaning and scope of the term 'direct result' in CP § 11-603(a)[,]" and that "this term is not defined in the definitions section of CP § 11-601[,]" granted *certiorari* to address the State's argument

> that rekeying the locks was a direct result of G.R.'s delinquent act because when the keys were stolen, the sanctity of the home which those locks protected had been jeopardized. As a result, the locks had been damaged or their value "substantially decreased" to an extent cognizable under CP § 11-603(a)(1). The State describes the choice to rekey the locks as a "reasonable and prudent" or "reasonable and proportional" response to the theft of the keys. In contrast, counsel for G.R. argues that the rekeying of the locks was an intervening act too far removed from the robbery to constitute a direct result. Maryland Crime Victims Resource Center, Inc., pursuant to Maryland Rule 8-511(a)(1), filed an amicus curiae brief that argues similar to the State

16

that the security of the homes the locks belonged to had been diminished when the keys were stolen; thereby, the costs incurred rekeying the locks was a direct result of the robbery.

*Id.* at *3.

The *G.R.* Court reaffirmed its prior decisions that any "references to reasonableness, within the context of the direct result requirement of CP § 11-603(a), are misguided as attempting to posit a tort causation standard within the context of direct result analysis." *Id*. at *8. Nevertheless, the Court agreed with the State that for purposes of CP § 11-603(a), the residential safety measures undertaken by the victim were the "direct result" of the robbery. *See id.* at *9.

Writing for a unanimous Court, Judge Getty examined *Pete* and other cases addressing whether certain losses were the "direct result" of the offenses in question:

> In prior cases, this Court has considered the direct result language of CP § 11-603(a). *In re Cody H*., 452 Md. 169; *Williams*, 385 Md. 50; *Goff*, 387 Md. 327; *Pete v. State*, 384 Md. 47 (2004). In *Pete*, we were asked to determine whether restitution was improperly awarded as a direct result of an underlying assault. *Id*. at 56-57. . . .
>
> On appeal, this Court concluded that the restitution order constituted an illegal sentence because the damages to the police cruiser were not a direct result of the assault. *Id*. at 61. The Court found the temporal relationship between the assault and the damage to the police cruiser dispositive . . . Therefore, we concluded that damage to the police cruiser was a direct result of Mr. Pete's reckless driving, which precluded a determination that the damage was a direct result of the earlier assault. *See id.*
>
> Subsequently, we considered the direct result requirement within the context of a theft. *Williams*, 385 Md. at 51. In *Williams*, a defendant stole multiple motorcycles from a victim's garage. 385 Md. at 51-52. After apprehending the defendant, police held three of the motorcycles at an impoundment lot in Baltimore City. *Id*. at 52. However, the victim was unable to recover the three motorcycles because he had never properly

17

acquired title to the vehicles. *Id*. at 53. The Circuit Court for Baltimore County awarded the victim restitution in the amount of $ 1,500. *Id*. at 54. On appeal, we vacated the circuit court's restitution order on the basis that the victim's failure to recover the motorcycles from the impoundment lot was not a direct result of the theft and . . . . that the victim's failure to properly title the motorcycles directly caused his inability to regain possession of them. *Id*. at 62-63.

In *Goff*, we held that damage to a victim's shower insert was a direct result of an assault and the circuit court did not err in ordering restitution to the victim for costs associated with replacing it. 387 Md. at 350. In that case, Mr. Goff forced entry into the victim's apartment, assaulted the victim in the bathroom, and damaged the shower insert. *Id*. at 332-33. In relation to these events, Mr. Goff was found guilty of second-degree assault and trespass. *Id*. at 331. Thereafter, the victim had the shower replaced rather than repaired. *See id.* at 333-34. The circuit court found restitution warranted and ordered Mr. Goff to pay restitution in the amount of $2,156.00 for the replacement of the damaged shower insert. *Id*. at 336.

Before this Court, Mr. Goff argued that the circuit court's order of restitution was in error because: "(1) the damage to the shower is not the direct result of the crime; (2) the shower is not the property of the victim; and (3) ordering replacement instead of repair is not fair and reasonable." *Id.* at 339. The *Goff* Court focused its analysis on the "natural and ordinary meaning" of the term "direct result" . . . . *Id*. at 344. The Court turned to the dictionary definition of "direct" establishing it as meaning "stemming immediately from a source, [as in direct] result . . . proceeding from one point to another in time or space without deviation or interruption . . . marked by absence of an intervening agency, instrumentality, or influence[.]" *Id*. at 344 n.9. In substantial reliance on *Pete*, 384 Md. 47, we determined that the shower lining was damaged as a direct result of the underlying assault. *See Goff*, 387 Md. at 343-44. In a footnote, we distinguished *Goff* from *Pete* based on the lack of time elapsing between the assault and the damage to the shower and the lack of an "intervening agent or occurrence [that] caused the damage." *Goff*, 387 Md. at 344 n.10.

More recently, we considered the direct result terminology in terms of a restitution order for loss of earnings. *In re Cody H*., 452 Md. at 184. We reiterated our conclusion in *Goff* by stating our interpretation of CP § 11-603(a) as "something is a 'direct result' where there is no intervening agent or occurrence separating the criminal act and the victim's loss." *Id*. at 195. Additionally, we noted that restitution cannot be ordered based upon

18

expenses that are speculative or not "reasonably certain to be incurred." *In re Cody H.*, 452 Md. at 186.

*Id*. at *3-5 (footnotes and some citations omitted).

Turning to the restitution order at hand, the Court of Appeals rejected the arguments advanced by G.R. and adopted by this Court that the robbery victim's "decision to rekey the locks was an intervening occurrence that directly resulted in any diminishment in value of the locks or out-of-pocket costs associated with rekeying, instead of a result from the underlying robbery." *Id*. at *5. To the contrary, the Court concluded that

> G.R.'s contentions overlook a subtle yet important nuance. Restitution may be ordered where the value of a victim's property is substantially decreased as a direct result of a crime or delinquent act. CP § 11-603(a)(1). Despite this, G.R. attempts to frame the substantial decrease or damage to the locks as occurring when the locks were rekeyed. However, as the State and Amicus point out, the value of the locks was substantially decreased when the keys were removed from the possession of J.S. during the course of the underlying robbery. For several reasons, we find G.R.'s contentions unpersuasive.
>
> **Household locks and the corresponding keys represent a greater ideal that can often be forgotten in the context of the everyday objects we encounter in our daily routines. Primarily, they represent the safety and sanctity of the home by protecting individuals from unwanted intrusions upon their personal privacy and safeguard against property crimes. Essentially, household locks and keys ensure the sanctity and security of the home. When such keys are taken by assailants through an armed robbery, such personal security is drawn into question. A victim can only be left to wonder whether future intrusions on the sanctity of the home may occur as a result of the stolen keys.**

*Id*. (emphasis added).

19

The Court was not persuaded by G.R.'s comparison of the stolen keys to the stolen motorcycles in *Williams* and the collision damage in *Pete,* explaining why the cost of rekeying was more comparable to the cost of repairing the shower in *Goff:*

> The factual scenario set forth in *Williams* is immediately distinguishable from the decision to rekey the locks in the instant case. In *Williams*, the victim could have negated any damages incurred through the loss of the motorcycles by sufficiently proving ownership of the vehicles because he would have been able to regain them. [*Williams*,] 385 Md. 50, 62 ("If Jones can muster some means of proving ownership and satisfy the Baltimore City authorities, he presumably will be able yet to recover the undamaged vehicles.") Based on the facts before us, the substantial decrease in the value of the locks could only be remedied by return of the keys without them being copied, or by rekeying the locks. Here, there is neither an indication that the victim was culpable to any degree nor that the cost associated could have been avoided independently of the underlying theft. Therefore, the facts of this case distinguish it from *Williams*.

> The direct result analysis of the current appeal leads us to a different conclusion when compared to *Williams* or *Pete*. In the instant case, the decision to rekey the locks cannot be described as an intervening occurrence to the extent that it would negate a direct causal relationship between G.R.'s armed robbery of J.S. in which the house keys were stolen. This case is more analogous to *Goff*. In *Goff*, the damage to the shower was directly and contemporaneously caused by Mr. Goff's assault on the victim. *Goff*, 387 Md. at 331-32. Mr. Goff's decision to replace the shower insert was not deemed an intervening occurrence and therefore did not preclude an award of restitution. *Id*. at 344.

> In the instant case, **although the locks were not directly damaged by the underlying robbery and theft of the corresponding keys, their value as protectors of household security and sanctity was substantially decreased. Despite the lapse of time between the robbery and the decision to rekey the locks, rekeying the locks was remedial in a similar fashion to replacing the damaged shower insert in *Goff*. The rekeying was necessary to repair the substantial decrease in the value of the locks – the compromised security of the homes those locks protected.** Accordingly, the decision to rekey the locks was not an intervening event as their substantial decrease in value can be directly attributed to G.R.'s delinquent act of robbery.

20

To hold otherwise and require "immediate damage" to sustain an order of restitution would largely contravene cases in which we have held that restitution may be ordered for lost wages. . . . [T]he Court of Special Appeals' immediacy requirement largely stands in opposition to our precedent concerning orders of restitution based on future lost wages and may, in certain circumstances, call into question orders of restitution based on lost wages generally.

*Id.* at *6-7 (emphasis added).

Next, the Court addressed contentions that the harm to the victim's household security could be remedied without rekeying the door locks:

Although G.R. notes that the keys were recovered and kept in a juvenile detention center shortly after G.R.'s arrest, both the victim and the State were unaware that the keys had been recovered until the restitution hearing before the juvenile court on June 16, 2017, over one month after the keys were initially stolen. We cannot say that this should be determinative of the outcome. If J.S. was aware that police recovered the keys, before the locks had been rekeyed, our conclusion may differ. In that situation, although copies of the keys could have been made, there would be a more substantial question as to the substantial decrease in value of the locks as a direct result of the theft. However, these are not the facts before us. Neither J.S. nor the State was aware that the keys had been recovered.

Accordingly, we determine that G.R.'s robbery of J.S., in which the house keys were taken, substantially decreased the value of the corresponding locks. **This necessitated rekeying the locks to protect the security and sanctity of the homes to which those keys belonged.**

*Id.* at *7-8 (emphasis added).

### 2. The Restitution Order

*In re G.R.* teaches that restitution may encompass expenses incurred to remediate "the security and sanctity" of a victim's home after it has been compromised as a "direct result" of the defendant's criminal conduct. Applying that lesson, we conclude that the trial court did not err or abuse its discretion in ordering restitution in the amount of $2,400,

21

to reimburse Ms. Coleman-Cannon for payment of a security deposit and first month's rent on property that her family abandoned to ensure their personal safety, as a direct result of appellant's crimes.

Appellant's contention that Ms. Coleman-Cannon made an intervening and superseding choice not to occupy the house is refuted by overwhelming evidence that vacating the property under police escort was the immediate and direct result of appellant's armed threats of arson and that abandoning the lease was necessary in the aftermath of those crimes.

The record shows the following:

- Appellant, who is "a certified member of the Black [Guerilla] Family," lived at 1735 East 30th Street, across the street from the house rented by the Cannons at 1738 East 30th Street.

- Before the Cannons began to move in on December 10, 2016, Ms. Coleman-Cannon paid her landlord $2,400.00, representing a security deposit equal to one month's rent and the first month's rent under the lease.

- Although some of the Cannons' belongings had been delivered to the new house, their violent altercations with appellant occurred before further deliveries were made. As Mr. Cannon arrived at the house that evening, his stepson, driving his wife's vehicle, was fired upon. The car windows were shattered, and the vehicle was "riddled with bullets."

- From a group of men standing at the corner, a man armed with a gun accosted Mr. Cannon and asked, "what's up with you all, yo?" When Mr. Cannon asked the group of men in the street why they were shooting and explained he was just trying to move into his house, appellant stated, "This is my block, I protect my block, we shoot first and ask questions later."

- Mr. Cannon called police and was waiting for them in the house when Ms. Coleman-Cannon arrived. By that time, people were gathering on the street, coming from the house across the street, around the corner, and behind cars, causing the Cannons to

fear for their safety. As the Cannons attempted to enter the house through a rear entrance, rather than an entrance that could not be seen by the crowd in the street, appellant followed them, raised his shirt, and pulled out a "big" gun.

- According to the Cannons, appellant "said that if any shots were fired off that night he was going to blow the house up. He was going to burn the house down. He was going to kill the kids in my house. Call the police if they want. They're not welcome on my block." Appellant "threatened us if we call the cops, we were, would be killed and the house would be burned down and he was going to kill the kids and all of those things."

- The Cannon family waited in the house for police to respond to their call, watching events unfold in front of the residence. According to Mr. Cannon, "[i]t was like a scene from a movie. . . . It was extremely hectic. There were people walking up and down the block. People were call[ing] me names, snitches and stuff like that, whatever. Um, the police seemed like they were in a tussle with them, with the guys across the street. Uh, helicopters showed up. Lights were flashing and we had to get escorted off the block [by police officers]."

- Confirming that account, Ms. Coleman-Cannon added that people were screaming threats and that it was so hectic even after the first set of police officers arrived, that she called 911 a second time because police were outnumbered.

- Responding officers testified that they witnessed "[n]umerous things including . . . threats of . . . violence and arson to not only the officers that were on the scene, but initially, as well as to the residents that were actually right across the street." Detective Marcus Sanders recounted that when he talked to appellant, "it was a reference to that house across the street. Uh, make sure that they're not there tomorrow. Uh, burn it down. Um, things of that nature."

- Footage from the detective's body camera was played for the jury. Appellant is recorded repeatedly threatening to burn down the Cannons' house, saying, "I'm trying to smoke somebody," "my bullets have names on them," and "1738 pack your shit up and leave. You all are going to [die]."

- Once police officers escorted them away, the Cannons never returned to the house. No one in the Cannon family spent a single night in the house.

- Although appellant was arrested and incarcerated, he remained a potential threat to the Cannons. Within hours of his incarceration, he made jail calls to associates in order to discuss guns in their possession. Police recovered the weapon that fired a

23

casing found in the street after the Cannons' vehicle was shot, on the roof of an apartment building occupied by an associate mentioned by appellant. On October 2, 2017, appellant tried to escape from the detention center, succeeding in "break[ing] though the concrete wall and see[ing] daylight though his cell" from "a hole in the side of the building." Just before trial started, Ms. Cannon-Coleman's son begged her not to testify, citing "a music video . . . that had surfaced that specifically referenced this incident . . . and that threats were made in the video."

- At sentencing, Ms. Coleman-Cannon described the "terror" resulting from appellant's threats and actions. In addition, her "seven-year-old daughter had nightmares and is afraid of large crowds and smoke." "[A]t the first sign of smoke she thinks [appellant has] found [them] and set [their] home on fire." As a result of the incident, the family "lost [their] savings[,]" their car, their home, their credit status, and their "peace of mind."

- Ms. Coleman-Cannon testified that the detective called and told them "that it wasn't safe for us to go back to that . . . property or to our other apartment . . . that we were vacating." Ms. Coleman-Cannon made efforts to recover some or all of the $2,400 from the landlord but was not successful.

This evidence amply supports the sentencing court's determination that the Cannons' abandonment of their leasehold was a "direct result" of appellant's armed threats to burn that house. *See* Crim. Proc. § 11-603(a). Like the cost of rekeying locks in *In re G.R.*, this out-of-pocket loss was caused by appellant's crimes. As in *G.R.*, Ms. Coleman-Cannon's $2,400 payment was for a residence – in this instance, a payment of first month's rent and a security deposit for property that the Cannon family fled under police escort. Police further instructed them not to return to the block.

The record supports the sentencing court's determination that remedial measures short of abandoning the property were not feasible. Given the immediate and continuing diminishment in the value of the property as a family residence, resulting from appellant's threats to burn it down, the breach in the security and the sanctity of that residence

24

necessitated leaving the residence for the protection of the family's personal safety. Because the loss of the security deposit and first month's rent was a direct result of appellant's crimes, the trial court did not err in sentencing appellant to pay restitution.

**JUDGMENTS OF CONVICTION AND SENTENCES, INCLUDING ORDER OF RESTITUTION, AFFIRMED. COSTS TO BE PAID BY APPELLANT.**