*Sharon Shivers v. State of Maryland*, No. 879, September Term 2021.  Opinion by Beachley, J.

**CRIMINAL LAW – RESTITUTION – ATTORNEY'S FEES – STATUTORY INTERPRETATION**

Facts:  Appellant was convicted of one count of theft of property valued between $25,000 and $100,000.  The basis for appellant's convictions were the withdrawals of $85,000 from her father's accounts.  The court sentenced appellant to six months' incarceration and ordered her to pay $6,000 in attorney's fees her father spent to recover his funds.

Held:  Judgment of conviction affirmed.  Restitution order reversed.

After holding that there was sufficient evidence to support appellant's theft conviction, the Court addressed the restitution award.

In a matter of first impression, the Court held that the circuit court erred in awarding the victim attorney's fees he incurred in an attempt to retrieve his funds pursuant to CJ § 11-603(a)(2)(ii) ("as a direct result of the crime or delinquent act the victim suffered . . . direct out-of-pocket loss").  Construing the statute's plain language and the context of the "direct out-of-pocket loss" provision within the subsection, the Court concluded that CP § 11-603(a)(2)(ii) exclusively authorizes a court to award restitution losses resulting from a victim's physical or mental injury.

Circuit Court for Prince George's County
Case No. CT190956X

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 879

September Term, 2021

_____

SHARON SHIVERS

v.

STATE OF MARYLAND

_____

Friedman,
Beachley,
Salmon, James P.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed:  January 3, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland.  The name change took effect on December 14, 2022.

Following a two-day trial, a jury in the Circuit Court for Prince George's County convicted appellant, Sharon Shivers,[1] of one count of theft of property valued between $25,000 and $100,000. At the restitution and sentencing hearing, the trial court ordered appellant to pay $6,000 in restitution—$5,000 directly to the victim, and $1,000 to the victim's attorney. The court then sentenced appellant to six months' incarceration. Appellant timely appealed and presents the following three questions for our review:

1. Is the evidence sufficient to support [appellant's] theft conviction?

2. Did the lower court err in excluding relevant, non-hearsay evidence which supported [appellant's] defense that she lacked the necessary *mens rea* for theft?

3. Did the lower court err in awarding attorney's fees as restitution in a criminal case?

We shall affirm appellant's conviction, but reverse the restitution award.

## FACTUAL AND PROCEDURAL BACKGROUND

John Smith, the victim in this case, is appellant's elderly father.[2] Following the passing of Mr. Smith's wife in 1987, he and appellant developed a somewhat strained relationship, and at one point did not communicate for approximately ten to fifteen years.

The two reconnected, however, when Mr. Smith, who had been residing in Laurel, Maryland, learned that appellant "was living a few miles from [him]," and that appellant

---

[1] Although this case was docketed in the Circuit Court for Prince George's County as "State v. Sheron Shiver," appellant spelled her name as "Sharon Shivers" while testifying at trial. We have changed the caption to reflect the correct spelling of appellant's name.

[2] At the trial, which took place on March 9 and 10, 2020, Mr. Smith testified that he was eighty-eight years old.

had a grandson (Mr. Smith's great grandson) whom Mr. Smith was eager to meet. Mr. Smith then called appellant, ending their estrangement, and appellant brought her grandson to meet Mr. Smith. Mr. Smith and appellant then began seeing each other regularly, with appellant bringing her grandson to Mr. Smith's home approximately twice a month.

Having reconnected with his daughter, in November of 2017, Mr. Smith decided to add appellant's name to his bank account. Mr. Smith did so because he had been experiencing medical issues, and he believed he could trust her to "write checks in case [he] couldn't write checks" to pay his bills and his mortgage in the event his medical issues incapacitated him or required hospitalization. Mr. Smith expressly conveyed to appellant that he was simply adding her name to his bank account to allow her to pay his bills if he was unable to do so.

In early 2019, there was approximately $95,000 in Mr. Smith's account. Mr. Smith intentionally chose not to invest this money, instead preferring to have immediate access to his funds. Mr. Smith reasoned that he needed immediately available funds to pay for several prescription drugs to treat his numerous medical conditions.

Both Mr. Smith and appellant agree that on March 1, 2019, appellant made two separate withdrawals from Mr. Smith's account. The first was a withdrawal of $35,000, which appellant placed into her own bank account. The second was a $50,000 withdrawal which appellant placed into a certificate of deposit in Mr. Smith's name. Appellant's and Mr. Smith's respective narratives for why this occurred, however, differ.

According to Mr. Smith, it was a complete surprise for him to learn that $85,000 was missing from his account. In April 2019, Mr. Smith went to a dental appointment and

2

received bills totaling $11,000. When Mr. Smith went to his bank to withdraw the money in order to pay the dental bills, he learned, for the first time, that appellant had taken his money. Mr. Smith was furious. He confronted appellant and asked for the money back. Appellant replied that she "would think about it." As of the trial—March 9 and 10, 2020—appellant had still not returned Mr. Smith's money.

According to appellant, however, her withdrawals were the result of conversations she had with Mr. Smith about how to use his funds. Appellant was partially motivated to transfer the funds based on her perception that Mr. Smith was exhibiting concerning behaviors. These included him asking appellant to purchase a sledgehammer so that he could destroy his own furniture in order to purchase smaller furniture that would fit in an assisted living facility, and Mr. Smith's diet consisting mostly of "StoveTop dressing and milk." Overall, appellant perceived that Mr. Smith "wasn't grasping what was going on." Based on these observations, appellant decided to withdraw $85,000 from Mr. Smith's account. She refused to return the money upon his request, telling Mr. Smith that she would "think about it." Appellant's rationale for refusing to return the money was that she believed she could better manage the funds than Mr. Smith. When asked at trial if she intended to hide the transaction from Mr. Smith, appellant testified, "No. Basically he knew about it."

As noted above, following a two-day jury trial, the jury convicted appellant of one count of theft of property valued between $25,000 and $100,000, leading to this timely appeal. We shall provide additional facts as necessary.

**DISCUSSION**

## I. THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE THEFT CONVICTION

Appellant first argues that the evidence was insufficient to support her conviction for theft. Specifically, she claims that the State failed to establish that she possessed the requisite intent to deprive Mr. Smith of his money, and that she did not actually deprive him of the money.

It is well-settled that an appellate court will not disturb a jury verdict if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

> Generally, if there are evidentiary facts sufficiently supporting the inference made by the trial court, the appellate court defers to that fact-finder instead of examining the record for additional facts upon which a conflicting inference could have been made, and then conducting its own weighing of the conflicting inferences to resolve independently any conflicts it perceives to exist.

*State v. Smith*, 374 Md. 527, 547 (2003).

In arguing that she lacked the intent to deprive Mr. Smith of his funds, appellant asserts that she possessed a good faith belief that she could withdraw the funds to "safeguard" them for her father due to his allegedly deteriorating mental state. In arguing that she did not actually deprive Mr. Smith of his property, appellant notes that Mr. Smith was able to immediately determine where his money was, and that, because she possessed a good faith belief that she was simply protecting Mr. Smith's assets, there was insufficient evidence to show that Mr. Smith would not be able to eventually recover his funds.

4

Appellant further argues that Mr. Smith never placed explicit restrictions on her access to the money. Appellant's arguments are unpersuasive.

Md. Code (2002, 2021 Repl. Vol.), § 7-104 of the Criminal Law Article ("CR")[3] provides, in relevant part, that "(a) A person may not willfully or knowingly obtain or exert unauthorized control over property, if the person: (1) intends to deprive the owner of the property." CR § 7-101(c) defines "deprive" as meaning:

to withhold property of another:

(1) permanently;

(2) for a period that results in the appropriation of a part of the property's value;

(3) with the purpose to restore it only on payment of a reward or other compensation; or

(4) to dispose of the property or use or deal with the property in a manner that makes it unlikely that the owner will recover it.

There is ample evidence on this record for the jury to have found the essential elements of theft beyond a reasonable doubt. *See Smith*, 374 Md. at 533.

First, appellant clearly exerted unauthorized control over Mr. Smith's property. Mr. Smith testified that he relied on the funds in his account to pay medical expenses, and that he "needed the money where [he] could get in touch with it right away." He further testified that he never gave appellant permission to take any money out of the account, that he never wanted to invest his money, and that the only reason he added appellant's name to his

_____

[3] Although we cite to the 2021 Replacement Volume, CR § 7-104 was last amended in 2017.

account was so that she could pay his bills in the event his health issues incapacitated or hospitalized him. Viewing this evidence in the light most favorable to the prosecution, a jury could rationally conclude that appellant exerted unauthorized control over Mr. Smith's property. *Id.*

The evidence was also sufficient to show that appellant intended to deprive Mr. Smith of his property. At trial, Mr. Smith testified that after he learned that appellant had taken $85,000 from his account, he demanded that she return it. Despite requesting that appellant return his money in April 2019, appellant had still not returned Mr. Smith's money as of the March 2020 trial. Appellant conceded this fact at trial, admitting that when Mr. Smith requested his money, she told him she would "think about it." Thus, the uncontradicted evidence showed that appellant withdrew $85,000 from Mr. Smith's account, made the funds inaccessible to Mr. Smith, and refused to return the funds upon request. Again, we conclude that a rational trier of fact could have found that appellant intended to deprive Mr. Smith of his property. *Id.*

Nor are we persuaded by appellant's claims that she never exerted unauthorized control over the funds because Mr. Smith never placed explicit restrictions on his account, or that appellant lacked the intent to deprive because she possessed a good faith belief that Mr. Smith's mental acuity was deteriorating. As to the explicit restrictions, Mr. Smith testified that he did not believe such action was necessary because he was "dealing with [his] blood daughter." As to appellant's good faith belief that she was protecting Mr. Smith's assets, the jury was free to reject that testimony. *See Abbott v. State*, 190 Md. App. 595, 616 (2010) ("Put another way, the jury is 'free to discount or disregard totally [a

6

defendant's] account of the incident[.]'" (quoting *Binnie v. State*, 321 Md. 572, 581 (1991))). Accordingly, we conclude that the evidence was sufficient to support appellant's theft conviction. *Smith*, 374 Md. at 547.

## II. THE TRIAL COURT DID NOT ERR IN EXCLUDING EVIDENCE CONCERNING APPELLANT'S DEFENSE

Appellant's second issue for our review is whether the trial court erred in excluding evidence that related to her perception of Mr. Smith's mental acuity. Specifically, appellant points to three instances during her direct examination in which the trial court sustained objections to her testimony. As we shall explain, in all three instances, appellant failed to meet her burden of establishing that the evidence—which was presumably excluded as hearsay—was admissible. In fact, at no point during the trial did appellant even raise the hearsay arguments she now presents in her brief. Even assuming, *arguendo*, that the evidence was improperly excluded, we conclude that any error was harmless beyond a reasonable doubt.

Maryland Rule 5-801(c) provides that "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, hearsay evidence is not admissible at trial. *See* Md. Rule 5-802. The Maryland Rules provide, however, that certain out-of-court statements are admissible despite the rule against hearsay. *See* Md. Rule 5-803; 5-804; 5-805. When a party seeks to admit ostensible hearsay, that party bears the burden of proving that the evidence is admissible. *See Morten v. State*, 242 Md. App. 537, 549–50 (2019) (noting that the proponent bears the burden of showing that a statement constituted

7

an exception to the rule against hearsay); *see also Stewart v. State*, 151 Md. App. 425, 447 (2003); *Parker v. State*, 365 Md. 299, 313 (2001).

The first statement appellant challenges on appeal concerned Mr. Smith's mental acuity. During her direct examination, appellant was explaining that, prior to her taking Mr. Smith's money, she had been helping him prepare papers in order to move him into an assisted living facility. Appellant testified that "we had signed papers for [Mr. Smith] to move into assisted living after his girlfriend called and told me that he needed to go into--." The prosecutor objected, and the trial court sustained the objection. Appellant attempted to continue, stating, "After I was contacted about him needing to move --." The prosecutor again objected and the trial court sustained the objection.

According to appellant, the trial court improperly excluded this evidence on hearsay grounds. On appeal, she argues that the court erred in excluding this testimony because the statements in question were not offered for their truth and therefore did not constitute hearsay. Despite her appellate assertion, the trial record is completely devoid of any argument by appellant that this evidence did not constitute hearsay because it was not offered for its truth. Indeed, at no point did appellant proffer any justification to the court that the evidence in question was admissible. By failing to make any arguments explaining why the evidence was admissible, appellant failed to meet her evidentiary burden. *See Morten*, 242 Md. App. at 549–50.

The second statement at issue also purported to relate to Mr. Smith's mental acuity. Appellant testified, "There were concerning behaviors. I talked to his -- the doctors. Someone had called me from a facility saying that--" at which point the prosecution

8

objected, and the trial court sustained the objection. Appellant's counsel seemingly acknowledged that appellant's intended testimony constituted inadmissible hearsay, advising appellant, "We're not telling us what other people said to you. You became concerned because at least you thought the -- what was happening to [Mr. Smith]?" Similar to the first statement, appellant never proffered why the excluded evidence should have been admitted, and therefore failed to meet her evidentiary burden. *Id*.

The last statement at issue concerned Mr. Smith's financial ability to qualify for an assisted living facility. Appellant testified, "[Mr. Smith] asked about whether he was going to qualify because of his assets. The person at the assisted living facility said --." The trial court sustained the prosecutor's objection. Again, appellant made no proffer at trial as to why this evidence should not be excluded as hearsay, and therefore failed to preserve the issue for our review. *Id*.

In summary, although appellant argues that all three excluded statements were relevant to her "honest belief" defense, she never informed the trial court of the non-hearsay purpose for which she wanted to introduce these statements.[4] We note that, from the trial court's perspective, all three statements made by third parties to appellant would

_____

[4] In an effort to support her claim that she did not need to make a proffer to the court, appellant points to several comments made by the court indicating that it did not believe Mr. Smith's mental state was relevant. Two of those comments by the court occurred during Mr. Smith's testimony as a rebuttal witness. We fail to see how these comments could relate to the statements the court excluded during appellant's earlier testimony. Appellant also quotes an excerpt from the court's ruling at the beginning of the trial on the inadmissibility of a police report, a ruling that she does not challenge on appeal. We likewise fail to see how that evidentiary ruling has any bearing on the court's exclusion of the three statements she complains were improperly excluded during her testimony later in the trial.

seemingly be quintessential hearsay. Because she failed to make known her purpose for introducing these statements, their admissibility is not preserved.

Even assuming that appellant properly preserved these issues for our review, and that the trial court erred by excluding the three statements, we would have no difficulty concluding that any error was harmless. It is well-settled in Maryland that

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dionas v. State*, 436 Md. 97, 108 (2013) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). We conclude that the exclusion of the evidence here in no way influenced the verdict.

Regarding the first two statements, appellant was able to introduce other evidence showing that she was concerned about Mr. Smith's deteriorating mental acuity. Specifically, she testified that Mr. Smith intended to purchase a sledgehammer in order to destroy his furniture, that "[h]e wasn't grasping what was going on[,]" and that he was mostly eating "StoveTop dressing and milk" but declined to have appellant arrange Meals on Wheels to deliver food to him. Thus, even assuming the trial court erred in excluding evidence regarding appellant hearing from other people that Mr. Smith exhibited concerning behaviors, appellant herself was permitted to testify why she believed Mr. Smith's mental state was deteriorating. As appellant notes in her brief, the purpose of showing these concerning behaviors to the jury was to justify her good faith belief that she

10

was protecting Mr. Smith's assets from himself. Because appellant was permitted to testify as to her own opinions and experiences regarding Mr. Smith's mental state, we conclude beyond a reasonable doubt that the court's exclusion of the first two statements in no way influenced the verdict.

We are further bolstered in our conclusion that any error in excluding the two statements concerning Mr. Smith's mental acuity was harmless beyond a reasonable doubt because, in closing argument, appellant's counsel barely mentioned Mr. Smith's mental state as a justification for appellant's actions. Instead, defense counsel's closing argument focused on the timing of the withdrawal in light of when appellant's name was added to the account, and that her leaving $10,000 in the account undermined any intent to permanently deprive Mr. Smith of his money.

We reach the same conclusion as to appellant's third challenged statement regarding whether Mr. Smith's assets would allow him to qualify for an assisted living facility. Although the trial court sustained the State's objection to appellant testifying what someone from the assisted living facility said regarding his assets, immediately following that ruling, appellant testified as follows:

> --for that particular assisted living facility there was no qualification requirements. However, in anticipation of planning for [Mr. Smith's] future, we talked about what look back period is which is basically a period of time that some facility and some government agencies look at your assets to determine whether or not you're qualified.

In light of the fact that appellant was permitted to testify as to Mr. Smith's assets impacting his qualification for an assisted living facility, we conclude that the trial court's

exclusion of the statement from someone at an assisted living facility was harmless beyond a reasonable doubt.

III. THE COURT DID NOT HAVE THE AUTHORITY TO AWARD ATTORNEY'S FEES UNDER THE RESTITUTION STATUTE

Appellant's final argument on appeal is that the sentencing court erred in ordering her to pay $6,000 in restitution. She essentially argues a *per se* rule that "attorney's fees are not recoverable as restitution in a criminal case" because a contrary holding "would violate Maryland public policy."

For background, we note that, prior to sentencing, the court held a hearing on Mr. Smith's request for restitution. At the hearing, William Byrd, Esquire, testified that Mr. Smith retained him to recover the stolen funds. After being retained, Mr. Byrd communicated with a Prince George's County detective as well as with the bank where Mr. Smith kept his money. Mr. Byrd explained that he successfully obtained a temporary restraining order and a preliminary injunction to prevent appellant from dissipating Mr. Smith's funds. Mr. Byrd testified that Mr. Smith had paid $5,000 in legal fees, and that Mr. Smith still owed an outstanding balance of $1,000. Appellant's counsel did not challenge the reasonableness of Mr. Byrd's fees. Nor did appellant argue that the attorney's fees incurred were not a direct result of the crime. At the time of the restitution hearing, Mr. Smith's civil conversion case against appellant was still pending, but both parties had agreed to stay the case pending the outcome of the restitution hearing.

In the circuit court, appellant's counsel made a cursory argument concerning restitution—he simply asserted that because attorney's fees were not in "the list established

12

in Section [11]-603," the court had no authority to award attorney's fees as restitution.[5] The court disagreed, finding that Mr. Smith was forced to hire an attorney as a direct result of appellant unlawfully converting the funds in his bank account. Relying on Md. Code (2001, 2018 Repl. Vol.), § 11-603(a)(2)(ii) of the Criminal Procedure Article ("CP"), the court determined that Mr. Smith had suffered a "direct out-of-pocket loss," and awarded Mr. Smith $5,000 in restitution, and Mr. Byrd $1,000 representing the outstanding balance due.

In her opening brief, appellant again argues that attorney's fees are not eligible for restitution under Maryland law. In addition to pointing out that attorney's fees are not enumerated as a recoverable expense under the restitution statute, appellant argues that "attorney's fees should not be recoverable as 'out of pocket losses' under CP § 11-603(a)(2)(ii) because this construction would violate Maryland public policy."[6] In her view, because attorney's fees are generally not recoverable in civil actions under the "American Rule," "this penal statute should not allow greater recovery for a victim via a

---

[5] Defense counsel further argued that the court should decline to order restitution because of appellant's indigency.

[6] We agree with the State's observation that appellant, in her opening brief, did not challenge the finding that the attorney's fees were incurred as a direct result of the crime. It is not surprising that appellant made no such appellate argument because defense counsel likewise made no contention in the trial court that the attorney's fees were not a direct result of the theft. We therefore agree with the State that whether the attorney's fees were incurred as a "direct result" of the crime is not preserved for appellate review. In that same vein, however, we reject the State's reliance on *In re G.R.*, 463 Md. 207, 214 (2019), because that case involved the interpretation of "the meaning and scope of the term 'direct result' in CP § 11-603(a)." Moreover, *In re G.R.* expressly construed the provisions of CP § 11-603(a)(1). *Id.* at 219. For the same reasons, the State's reliance on *Shannon v. State*, 241 Md. App. 233 (2019), is misplaced.

13

criminal restitution award than the victim could recover in a civil case."

As noted, the sentencing court awarded restitution pursuant to CP § 11-603(a)(2), which provides, in relevant part, that:

> (a) A court may enter a judgment of restitution that orders a defendant . . . to make restitution in addition to any other penalty for the commission of a crime . . . if:
>
> . . . .
>
> > (2) as a direct result of the crime or delinquent act the victim suffered:
> >
> > > (i) actual medical, dental, hospital, counseling, funeral, or burial expenses or losses;
> > >
> > > (ii) direct out-of-pocket loss;
> > >
> > > (iii) loss of earnings; or
> > >
> > > (iv) expenses incurred with rehabilitation[.]

In support of the court's ruling, the State asserts that because Mr. Smith hired an attorney to prevent "further, likely irreparable, losses," the attorney's fees incurred are "akin to medical expenses and other direct out-of-pocket losses" which Maryland courts have approved as restitution. The State further argues that the "American Rule" is irrelevant in criminal restitution proceedings.[7]

---

[7] Although appellant's brief includes a summary assertion that "attorney's fees are not recoverable . . . under CP § 11-603(a)(1)" ("as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased"), the State did not address this argument in its brief. The State's failure to do so is understandable because the circuit court granted restitution based on CP § 11-603(a)(2)(ii), not CP § 11-603(a)(1). In any event, we shall not consider whether the court's order for attorney's fees could be sustained under CP § 11-603(a)(1). *Klauenberg v. State*, 355 Md. 528, 552 (1999) (stating that "arguments not presented in a brief or not presented with particularity will not be considered on appeal").

14

"We ordinarily apply the abuse of discretion standard in reviewing a trial court's order of restitution." *In re Cody H.*, 452 Md. 169, 181 (2017). However, we review *de novo* questions involving statutory interpretation. *Id.*

The canons of statutory interpretation are well-settled in Maryland. "When undertaking an exercise in statutory interpretation, we start with the cardinal rule of statutory interpretation—to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021) (citing *75-80 Properties, L.L.C. v. RALE, Inc.*, 470 Md. 598, 623 (2020)). Our primary goal in interpreting statutory language "is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Id.* (quoting *Lockshin v. Semsker*, 412 Md. 257, 274 (2010)).

When undertaking a statutory interpretation analysis, "our analysis begins with the normal, plain meaning of the language of the statute. In doing so, we read the plain meaning of the language of the statute 'as a whole, so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Id.* (internal citation omitted) (quoting *Koste v. Town of Oxford*, 431 Md. 14, 25–26 (2013)). "[A]ll statutory interpretation begins, and usually ends, with the statutory text itself for the legislative intent of a statute primarily reveals itself through the statute's very words." *Pete v. State*, 384 Md. 47, 57 (2004) (quoting *Price v. State*, 378 Md. 378, 387–88 (2003)). Our review of the plain language is not exclusively limited to the provision in question. *Berry v. Queen*, 469 Md. 674, 687 (2020) (citing *Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 415 (2020)). "Instead, '[t]he plain language must be viewed within the context of the

statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Id*. (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)).

If the words of a statute are "ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia[.]" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *State v. Bey*, 452 Md. 255, 266 (2017)). Even where the statutory language is not ambiguous, however, "it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language." *Id*. (quoting *State v. Roshchin*, 446 Md. 128, 140 (2016)). As a penal statute, CP § 11-603 must be narrowly construed. *Addison v. State*, 191 Md. App. 159, 180–81 (2010); *McCrimmon v. State*, 225 Md. App. 301, 307 (2015). Nevertheless, if there is competent evidence to support the victim's restitution claim, a victim is presumed to have a right to restitution. CP § 11-603(b).

We begin with the statute's plain language. The court awarded attorney's fees because it determined that the victim suffered a "direct out-of-pocket loss" pursuant to CP § 11-603(a)(2)(ii). The phrase "direct out-of-pocket loss" is not defined in the subtitle's definitional section, CP § 11-601. In considering the phrase within the context of the statutory scheme, we note that CP § 11-603(a)(2)(i), (iii) and (iv) allow a victim to recover as restitution: "actual medical, dental, hospital, counseling, funeral, or burial expenses or losses" (CP § 11-603(a)(2)(i)); "loss of earnings" (CP § 11-603(a)(2)(iii)); and "expenses

16

incurred with rehabilitation" (CP § 11-603(a)(2)(iv)). Thus, we note that CP § 11-603(a)(2)(i), (iii), and (iv) relate to expenses incurred and losses sustained by a victim as a result of physical or mental injury.

Our research reveals that CP § 11-603 traces its lineage to the enactment of chapter 581 of the Laws of Maryland (1977) that became Article 27, Section 640 of the Maryland Code effective July 1, 1977. The purpose paragraph of the statute provided, in relevant part:

> For the purpose of providing that a court may order a criminal defendant to make restitution of certain losses sustained by a victim *or* certain property owned by a victim of the crime perpetrated by the defendant[.]

(Emphasis added). Article 27, Section 640(b) provided:

> Upon conviction for a crime where property of another has been stolen, converted, unlawfully obtained, or its value substantially decreased as a direct result of the crime, *or* where the victim suffered actual medical expenses, direct out of pocket losses, or loss of earning as a direct result of the crime, the court may order the defendant to make restitution in addition to any other penalty provided for the commission of the crime.

 (Emphasis added).

The initial restitution statute enacted in 1977 evidences an intent to distinguish between property crimes and crimes involving injury to a person. As noted in *Gilroy v. SVF Riva Annapolis LLC*, the word "'Or' generally has a disjunctive meaning, that is, the word is used to indicate 'an alternative between unlike things, states, or actions[.]'" 234 Md. App. 104, 111 (2017) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1585 (1986)). Although this interpretation is not absolute, "Maryland courts generally interpret 'or' in the disjunctive sense when they construe statutes." *Id.* at 111.

17

Thus, from a grammatical standpoint, Article 27 Section 640(b) distinguishes between restitution for crimes "where property of another has been stolen, converted, unlawfully obtained, or its value substantially decreased," and crimes "where the victim suffered actual medical expenses, direct out of pocket losses, or loss of earning."

Section 640(f), as enacted in 1977, supports the distinction between property crimes and personal injury crimes:

> An order of restitution may not preclude *the owner of the property or the victim who suffered personal physical or mental injury or out of pocket loss of earnings or support* from proceeding in a civil action to recover damages from the defendant. A civil verdict shall be reduced by the amount paid under the criminal restitution order.

(Emphasis added). We note that the language in § 640(f) concerning "personal physical or mental injury" was also included in the initial version of HB 1680 related to Section 640(b), but that language was ultimately deleted. *See* House Bill file for HB 1680 (regular session 1977) p. 68/69. It is apparent from the statute's purpose paragraph and adopted text that the legislature sought to distinguish property crime victims from victims who sustain physical or mental injury. That the legislature struck "personal physical or mental injury" in subsection (b) in favor of "actual medical expenses" does not undermine that conclusion, particularly in light of the retention of language in CP § 11-603(c) of the current statute that distinguishes between "property owner or the victim who suffered personal physical or mental injury."

In 1982, the General Assembly amended Art. 27 § 640 because of its disagreement

18

with the Supreme Court of Maryland's[8] decision in *Montgomery v. State*, 292 Md. 155 (1981), where the Court held that insurers and similar third parties could not be awarded restitution under the statute. The 1982 amendments therefore had no substantive effect on the provisions of subsection (b) that are relevant in the case at bar, but the 1982 amendment, for the first time, separated property losses from other losses:

> (1) On conviction of a crime, the court may order the defendant to make restitution in addition to any other penalty for the commission of the crime, if:
>
> > (i) Property of the victim was stolen, converted, unlawfully obtained, or its value substantially decreased as a direct result of the crime;
> >
> > (ii) The victim suffered actual medical expenses, direct out-of-pocket losses, or loss of earnings as a direct result of the crime; or
> >
> > (iii) The victim incurred medical expenses that were paid by the Department of Health and Mental Hygiene or any other governmental entity.

The statute was next amended as part of the Victims' Rights Act of 1997. Relevant here, the legislature amended Art. 27 § 640(b)(1)(ii) to add dental, hospital, counseling, funeral, and burial expenses as recoverable restitution. Consequently, after passage of the Victims' Rights Act of 1997, Section 640(b)(1)(ii) provided for restitution where "[t]he victim suffered actual medical, dental, hospital, counseling, funeral, burial expenses, any other direct out-of-pocket losses, or loss of earnings as a direct result of the crime." Significantly, "direct out-of-pocket losses" and "loss of earnings" were included in the

---

[8] On December 14, 2022, the name of the Court of Appeals was changed to the Supreme Court of Maryland.

19

same paragraph as actual medical, dental, and other expenses sustained by the victim as a result of the criminal or delinquent act.

The statute was amended without substantive change as part of the Code revision creating the Criminal Procedure Article (effective October 1, 2001).  *See Grey v. Allstate Ins. Co.*, 363 Md. 445, 450 n.1 (2001).  However, as part of the Code revision process, the statute further separated into distinct subsections the types of expenses and losses that a victim could recover:

(a)(2) As a direct result of the crime or delinquent act, the victim suffered:

    (i)    Actual medical, dental, hospital, counseling, funeral, or burial expenses;

    (ii)   Any other direct out-of-pocket loss; or

    (iii)  Loss of earnings[.]

Finally, in 2005, the General Assembly amended CP § 11-603(a)(2) to make clear that the court was authorized to award "expenses incurred with rehabilitation."  S.B. 873, 2005 Leg., Reg. Sess. (Md. 2005).  Accordingly, since 2005, CP § 11-603(a)(2) has delineated four categories of recoverable losses and expenses directly attributable to a criminal or delinquent act:

    (i)    actual medical, dental, hospital, counseling, funeral, or burial expenses or losses;

    (ii)   direct out-of-pocket loss;

    (iii)  loss of earnings; or

    (iv)  expenses incurred with rehabilitation.

Our review of the plain statutory text and legislative history leads us to conclude that CP § 11-603(a)(2)(i)-(iv) exclusively authorizes a court to award restitution for a victim's expenses and losses resulting from physical or mental injury. Nothing in the legislative history or caselaw construing the statute would support the view that a property crime victim could recover actual medical and hospital expenses, loss of earnings, or rehabilitation expenses as set forth in subsections (i), (iii) and (iv) of the statute. It would therefore be illogical to conclude that subsection (ii)'s authorization for direct out-of-pocket loss would be applicable to victims of theft and other property crimes, but the adjacent subsections would not. *See Lawrence v. State*, 475 Md. 384, 406–07 (2021) (noting that statutory interpretation "seek[s] to avoid constructions that are illogical, unreasonable, or inconsistent with common sense" (quoting *Della Ratta v. Dyas*, 414 Md. 556, 567 (2010))).

Our conclusion is bolstered by the doctrine of *ejusdem generis*, a canon of statutory construction which applies where

> (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplement[s] the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires.

*In re Wallace*, 333 Md. 186, 190 (1993) (quoting 2A Sutherland Stat. Const. § 47.18, at 200 (5th ed. 1992)). Where these conditions are present, "the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned." *Id.* (quoting *Giant of Md. v. State's Att'y*, 274 Md. 158, 167 (1975)). "In addition, *ejusdem generis* is applied 'more strictly in the construction of penal

21

statutes . . . since penal statutes shall be narrowly construed.'" *Id.* at 191 (alteration in original) (quoting *Giant of Md.*, 274 Md. at 167–68).

Of the four categories of restitution delineated in CP § 11-603(a)(2), subsection (ii)'s "direct out-of-pocket loss" represents the only category defined by a general word or phrase. Subsections (i), (iii), and (iv) delineate specific recoverable expenses and losses that suggest a class of expenses and losses likely to be sustained by victims of crimes that result in physical or mental injuries. Moreover, the class is not exhausted by the specifically enumerated items, as the statute does not include, for example, transportation expenses related to medical appointments or the installation of a ramp outside the home of a victim who requires a wheelchair as a result of his or her injuries. In our view, the legislature adopted the general phrase "direct out-of-pocket loss" in CP § 11-603(a)(2) because it intended to authorize courts to award restitution for out-of-pocket losses resulting from physical and mental injuries that were not specifically enumerated in subsections (i), (iii), and (iv). *See also Emmert v. Hearn*, 309 Md. 19, 25 (1987) (noting that "[t]he maxims [of *noscitur a sociis* and *ejusdem generis*] mean that the meaning of a word is or may be known from the accompanying words so that, under the rules, general and specific words, capable of analogous meaning, when associated together, take color from each other, so that general words are restricted to a sense analogous to less general" (quoting *Leroy v. Kirk*, 262 Md. 276, 283 (1971))).

In short, CP § 11-603(a)(2)(i)–(iv) apply exclusively to crimes involving physical and/or mental injury. We therefore conclude that the court erred in awarding Mr. Smith

attorney's fees he incurred to recover his funds pursuant to CP § 11-603(a)(2)(ii)'s

provision for direct out-of-pocket loss.

**JUDGMENT OF CONVICTION AFFIRMED. JUDGMENT FOR RESTITUTION REVERSED. COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES.**